11 P.3d 1219

2000-NMCA-087

**SONIC INDUSTRIES, INC., Plaintiff–Appellant/Cross–Appellee,**

v.

**STATE of New Mexico and John Chavez, Secretary of the New Mexico Taxation and Revenue Department, Defendants–Appellees/Cross–Appellants.**

No. 20,676.

Court of Appeals of New Mexico.

July 3, 2000.

Certiorari Granted, No. 26,447, Oct. 6, 2000.

Daniel H. Friedman, Simons, Cuddy & Friedman, LLP, Santa Fe, NM for Appellant.

Patricia A. Madrid, Attorney General, Bridget A. Jacober, Special Assistant Attorney General, Santa Fe, NM, for Appellees.

Curtis W. Schwartz, Timothy C. Holm, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Santa Fe, NM, for Amicus Curiae–Long John Silver's, Inc.

## OPINION

ALARID, Judge.

{1} This interlocutory appeal requires us to determine the effect of a 1991 amendment to Subsection 7–9–3(J) of the Gross Receipts and Compensating Tax Act, NMSA 1978, §§ 7–9–1 through 7–9–89 (1966, as amended through 2000) (the Act) on the New Mexico Taxation and Revenue Department's (the Department) authority to assess gross receipts tax on royalty fees paid by New Mexico franchisees to Sonic Industries, Inc., (Sonic) an out-of-state franchiser of a fast-food restaurant system. We also address the issues of whether Sonic's franchising activities are a separate taxable activity from the selling of food by franchisees; whether the Department's notice of assessment was timely; and whether Sonic is subject to a penalty for negligent failure to report and pay gross receipts taxes on royalty payments made by New Mexico franchisees.

## BACKGROUND

{2} Sonic is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Sonic has developed a for-mat for operating fast-food restaurants known as the "Sonic System." Sonic itself does not own or operate restaurants in New Mexico and has no office, warehouse, or resident salesperson in New Mexico. Sonic enters into standardized "License Agreements" with the owners of the restaurants, who agree to operate Sonic restaurants at specified locations in New Mexico according to the Sonic System. The License Agreement describes the Sonic System as "the distinctive and proprietary drive-in, food service system ... under which food is sold to the public from drive-in restaurants operated under the trade name and federally registered trademark and service mark 'Sonic.' " Each owner pays Sonic a percentage of the restaurant's monthly gross sales as a royalty.

{3} The Department assessed Sonic $144,152.05 for gross receipts taxes for the period December 1988 through December 1994. The Department also assessed $88,789.62 in interest and penalty. Sonic paid the assessment and filed a claim for refund with the Department. The Department denied the claim. Sonic then filed a Complaint for Refund of Taxes Paid in the district court.

{4} In the district court, Sonic moved for partial summary judgment arguing that its franchising activities constitute non-taxable out-of-state sales of licenses and associated services. Since the Department did not dispute the factual basis of Sonic's motion, the motion raised a pure question of law. The Department filed a cross-motion for full summary judgment. In its response, Sonic argued that genuine issues of material fact precluded summary judgment in the Department's favor. The district court denied both motions for summary judgment, but certified both rulings for interlocutory appeal pursuant to NMSA 1978, § 39–3–4(A) (1999).

## DISCUSSION

I. *Sonic's Motion for Partial Summary Judgment*

{5} Summary judgment is appropriate where, as here, the material facts are undisputed and the only matter to be resolved is the legal effect of those facts. *See Johnson v. Yates Petroleum Corp.*, 1999–NMCA–066,

¶ 3, 127 N.M. 355, 981 P.2d 288. In reviewing the grant or denial of a motion for summary judgment, we apply a de novo standard of review. *See id.*

{6} Under the Act, "gross receipts" include: "the total amount of money or the value of other consideration received from selling property in New Mexico [or] from leasing property employed in New Mexico." NMSA 1978, § 7–9–3(F) (1978, as amended 1989). In 1979, this Court applied a substantially-similar prior version of this statute in three cases upholding the assessment of gross receipts tax on franchise fees paid to out-of-state franchisers. *See AAMCO Transmissions, Inc. v. Taxation & Revenue Dep't*, 93 N.M. 389, 600 P.2d 841 (Ct.App. 1979); *Baskin–Robbins Ice Cream Co. v. Revenue Div.*, 93 N.M. 301, 599 P.2d 1098 (Ct.App.1979); *American Dairy Queen Corp. v. Taxation & Revenue Dep't*, 93 N.M. 743, 605 P.2d 251 (Ct.App.1979). In each case, we relied on the statutory definition of gross receipts as the total money or other consideration received by the taxpayer "from *leasing* property employed in New Mexico." Section 7–9–3(F) (emphasis added). We reasoned that the franchisers had property *employed in* New Mexico in the form of trademarks and other intangible rights licensed to and used by the in-state franchisees.

{7} As of 1979, when we decided *AAMCO, Baskin–Robbins,* and *American Dairy Queen,* the Act defined leasing as "any arrangement whereby, for a consideration, property is employed for or by any person other than the owner of the property." NMSA 1978, § 7–9–3(J) (1978). During the 1991 legislative session, the Fortieth Legislature amended Section 7–9–3(J) to read:

"leasing" means any arrangement whereby, for a consideration, property is employed for or by any person other than the owner of the property, *except that the granting of a license to use property is the sale of a license and not a lease* [.]

1991 N.M. Laws, ch. 203, § 1 (emphasis added).

{8} Sonic argues that we must revisit the issue decided by our earlier cases because the 1991 amendment to Subsection 7–3–9(J) has overturned *AAMCO, Baskin–Robbins,* and *American Dairy Queen* to the extent they relied on the premise that licensing fees paid to a franchiser constitute receipts from "leasing property employed in New Mexico." Sonic points out that under the amended version of Subsection 7–9–3(J), the granting of a license to use the Sonic System now constitutes *selling,* not leasing as in 1979 when we decided *AAMCO, Baskin–Robbins,* and *American Dairy Queen.* Second, Sonic argues that license fees paid by New Mexico franchisees do not satisfy the alternative definition of gross receipts as receipts from "*selling* property *in* New Mexico" because Sonic structured the franchise transactions so that the License Agreements became effective in Oklahoma, not New Mexico. According to Sonic, we should apply a place-of-contracting rule and hold that to the extent Sonic was engaged in selling licenses to use the Sonic System, it was engaged in selling *in Oklahoma,* not in New Mexico.

{9} We agree with Sonic's first point. A Sonic franchise, as defined in the standard License Agreement, consists of a bundle of intangible, intellectual property rights and associated services. Pursuant to its standard License Agreement, Sonic grants a New Mexico franchisee the "right, license and privilege" to "adopt and use"the Sonic System at a specified location in New Mexico. Sonic retains ultimate ownership of all intellectual property used by the franchisee pursuant to the License Agreement. In our view, when Sonic enters into a Sonic License Agreement, Sonic clearly is engaging in the "granting of a license to use [the Sonic System]," and thus, by operation of the 1991 amendment to Subsection 7–9–3(J), this activity constitutes "selling." To the extent our decisions in *AAMCO, Baskin–Robbins,* and *American Dairy Queen* proceeded from the assumption that the licensing of a franchiser's system constituted "leasing property in New Mexico," that former analysis is foreclosed by the 1991 amendment to Subsection 7–9–3(J). Accordingly, subsequent to the July 1, 1991, effective date of the amended version of Subsection 7–9–3(J), neither this Court nor the Department may rely upon the definition of gross receipts as receipts from "leasing property employed in New Mexico"

to support the imposition of gross receipts tax on royalty fees paid to Sonic by New Mexico franchisees.

{10} We disagree, however, with Sonic's second point. As we explain below, the Legislature's reclassification of licensing as a subclass of selling does not affect the status of franchise fees paid as gross receipts.

{11} Our Legislature has taken the following approach: an exhaustive definition of gross receipts, which is then qualified by numerous exemptions and deductions. The Act imposes a tax on the privilege of "engaging in business in New Mexico." Section 7-9-4. As of 1979, when we decided *AAMCO, Baskin–Robbins,* and *American Dairy Queen,* the Act divided the universe of activities that constitute engaging in business in New Mexico into three categories: "selling property in New Mexico," "leasing property employed in New Mexico," and "performing services in New Mexico." 1969 N.M. Laws, ch. 144, § 1.

{12} In 1991, the Legislature chose to reclassify licensing as a form of selling. Sonic argues that this "seemingly small legislative amendment profoundly alters New Mexico's tax structure." The flaw in Sonic's argument is that it fails to acknowledge that for purposes of Subsection 7-9-3(F)'s definition of gross receipts, the 1991 amendment worked a zero-sum game: to the extent the reclassification of licensing results in fewer transactions that constitute "leasing," it results in correspondingly more transactions that constitute "selling." Thus, although the 1991 amendment requires us to alter our *analysis* of franchise fees under the Act, it does not change the *result* reached in the 1979 trilogy of franchise cases unless a Sonic franchise can be "in New Mexico" for purposes of the phrase "leasing property employed in New Mexico," but not be "in New Mexico" for purposes of the phrase "selling property in New Mexico."

{13} This brings us to Sonic's second point. Sonic argues that we should construe the phrase "selling property in New Mexico" so that selling occurs "in" New Mexico only if New Mexico is the place of contracting, the place where the last act necessary to form a binding contract occurred. Thus, according to Sonic, because Sonic carefully structures its franchise transactions so that the last act necessary to validate a License Agreement occurs out-of-state, no sale occurs "in New Mexico." Under Sonic's suggested interpretation, a New Mexico vendor and a New Mexico vendee involved in a sale of New Mexico real estate or of goods manufactured in New Mexico for use in New Mexico could evade the Act simply by stepping across the state line into a neighboring state to sign the sales agreement. We think it highly unlikely that the Legislature intended the phrase "selling in New Mexico" to have a meaning that would leave the Act vulnerable to evasion by such an obvious subterfuge.

{14} In our view, the Legislature used the phrase "in New Mexico" in Subsection 7-9-3(F), not in a formalistic sense as suggested by Sonic, but rather to reinforce the requirement that the activities generating receipts subject to taxation under the Act must have a sufficient nexus with New Mexico to support taxation by New Mexico. *See, e.g., Proficient Food Co. v. New Mexico Taxation & Revenue Dep't,* 107 N.M. 392, 395, 758 P.2d 806, 809 (Ct.App.1988) (noting relationship of taxpayer's in-state activities to establishing and holding a New Mexico market; upholding Department's determination that taxpayer was engaged in selling property in New Mexico despite facts that goods were stored in warehouse in Texas and invoices handled at out-of-state corporate offices of buyers and taxpayer-seller). The Legislature's inclusion of a "savings" provision providing a deduction "to the extent that the imposition of the gross receipts tax would be unlawful under the United States constitution," NMSA 1978, § 7-9-55(A) (1969), strongly suggests that the Legislature meant the term "in New Mexico" to extend the reach of the Act to its constitutional limits. *See* Michael S. Yesley, *Out of Sight But Not Out of Mind: New Mexico's Tax on Out–of–State Services,* 20 N.M. L.Rev. 501, 522 (1990). By 1969, when the Act was amended to add franchises to the Act's definition of property, it was well-settled that intangible property has a nexus with a state sufficient to support taxation when the taxpayer has

extended its activities with respect to its intangible property so as to invoke the protection and benefit of the taxing state's laws. *See, e.g., Curry v. McCanless,* 307 U.S. 357, 367, 59 S.Ct. 900, 83 L.Ed. 1339 (1939).

{15} We are unable to see how a franchiser's property could be "in" New Mexico so that it could be *"employed in* New Mexico" by the franchisees in *AAMCO, Baskin–Robbins,* and *American Dairy Queen,* yet not be "in New Mexico" in the present case merely because the Act now classifies the activity of licensing franchises as a form of selling instead of leasing. The 1991 amendment reclassifying licensing as selling did not alter whatever economic nexus exists between Sonic and commercial activity carried on within New Mexico by Sonic franchisees. We hold that fees paid to Sonic by New Mexico franchisees for the right to operate Sonic restaurants located in New Mexico constitute receipts from selling property *in* New Mexico and are gross receipts within the meaning of Subsection 7–9–3(F). Although the 1991 amendment to Subsection 7–9–3(J) requires us to modify the analysis we applied in *AAMCO, Baskin–Robbins,* and *American Dairy Queen,* ultimately it does not alter the result. Accordingly, we conclude that the district court properly denied Sonic's motion for partial summary judgment.

{16} We recognize that the Legislature must have intended the 1991 amendment to Subsection 7–9–3(J) to have some effect. *See State ex rel. Bird v. Apodaca,* 91 N.M. 279, 284, 573 P.2d 213, 218 (1977). If, as we have concluded, the 1991 amendment has no effect on the taxability of franchise fees, the Legislature must have had some other purpose in mind in amending Subsection 7–9–3(J). The fact that we have rejected Sonic's interpretation of the 1991 amendment to Subsection 7–9–3(J) does not mean that the amendment will not have an effect on other taxpayers in other circumstances. By way of example, the distinction between selling and leasing appears to have been crucial to the operation of many of the deductions contained in the 1991 version of the Act. *See, e.g.,* NMSA 1978, § 7–9–47 (1969) (providing deduction for receipts from sale for resale of tangible personal property); NMSA 1978, § 7–9–50 (1969, as amended through 1991) (providing deduction for receipts from lease for release of tangible personal property). We anticipate that there will be situations in which the reclassification of licensing as selling will be dispositive.

## II. *The Department's Motion for Full Summary Judgment*

{17} In addition to opposing Sonic's motion for partial summary judgment, the Department filed its own motion for full summary judgment seeking determinations that (1) Sonic's franchising activities are a taxable activity under the Act, (2) Sonic's defense that the assessment was untimely is legally insufficient, and (3) Sonic is not entitled to abatement of penalty. Sonic filed a response in which it set forth what it viewed as additional material facts, which were grouped under four headings.

{18} Under the first heading, "Facts Relevant to Sonic's Performance of Services Outside New Mexico Under Its License Agreements for the Benefit of New Mexico Licensees, Receipts From Which Are Non–Taxable," Sonic set out various facts demonstrating that Sonic performs services for licensees, including assistance on building design and site location, "access to financial resources," "promotional campaigns and suggestions," advertising, purchasing cooperatives, revised operating procedures, new or modified products, and "a variety of other assistance." According to Sonic's statement of additional facts, these services are performed outside New Mexico, "typically in Oklahoma," and of themselves are "independently worth the portion of the gross revenues which Sonic licensees pay to Sonic Industries, Inc."

{19} Under the second heading, "Facts Relevant to Whether Sonic Industries, Inc.'s Revenues from New Mexico Licensees Consist of a Contractually Predetermined Percentage of the Licensee's Gross Revenues, on Which the Licensees Have Already Paid New Mexico Gross Receipts Tax," Sonic set out various facts in support of Sonic's argument that Sonic and its franchisees are collectively engaged in a single business—the

selling of food—which should be taxed only at the point of sale.

{20} Under the third heading, "Facts Relevant to Sonic's Entitlement to Abatement of the Portion of the Assessment Attributable to Periods Prior to December of 1989, Because of the Department's Failure to Serve the Assessment on it Prior to 1996," Sonic set out various facts demonstrating that the Department mailed its November 20, 1995, assessment to the wrong address with the result that Sonic did not receive a copy of the assessment until February 8, 1996.

{21} Under the fourth heading, "Facts Relevant to Sonic's Entitlement to Abatement of Penalty," Sonic set out various facts in an effort to demonstrate the reasonableness of its failure to pay gross receipts tax on franchise fees paid by New Mexico licensees.

{22} The Department argues that Sonic's facts should not have precluded the district court from granting summary judgment because, notwithstanding those facts, each of Sonic's defenses could be disposed of as a question of law. We understand the Department to be arguing that Sonic's facts were not material to the dispositive questions of law presented by its motion. As explained below, except as to the issue of the abatement of taxes accruing prior to December 1989, we agree with the Department that Sonic's facts do not establish genuine issues of *material* fact and that the Department therefore was entitled to judgment in its favor as a matter of law.

*Taxability of Separate Components of a Sonic Franchise*

■■■ {23} The rights conveyed by a Sonic License Agreement consist of a bundle of intangible, intellectual property rights typically associated with franchises, *see generally* David Gurnick, *Intellectual Property in Franchising: A Survey of Today's Domestic Issues*, 20 Okla. City U.L.Rev. 347 (1995), together with various support services. In our view, the interest transferred by a Sonic License Agreement meets the traditional definition of a franchise:

> In its simplest terms a franchise is a license from the owner of a trademark or trade name permitting another to sell a

product or service under that name or mark. More broadly stated, the franchise has evolved into an elaborate agreement under which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchiser and the franchiser undertakes to assist the franchisee through advertising, promotion and other advisory services.

*H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 493 P.2d 205, 211–12 (1972) (quoted with approval in *Baskin–Robbins*, 93 N.M. at 303, 599 P.2d at 1100).

■ {24} By 1969, when the Legislature extended the Act's definition of property to "licenses, franchises, patents, trademarks and copyrights," the use of the term franchise to describe a prepackaged system for doing business appears to have been well established. *See, e.g.,* Harold Brown, *The Franchise Phenomenon*, 73 Case and Comment, July–August 1968, at 46; *Susser v. Carvel Corp.*, 332 F.2d 505 (2d Cir.1964). We may presume that the Legislature intended the term franchise to have its ordinary and usual meaning as a prepackaged form of doing business unless a different meaning clearly is indicated. *See Medina v. Original Hamburger Stand*, 105 N.M. 78, 80, 728 P.2d 488, 490 (Ct.App.1986). We find no such clear indicia suggesting that the Legislature used franchise in some unusual sense.

■ {25} Moreover, following the 1969 amendment to Subsection 7–9–3(I), the Department adopted the following regulation defining the term franchise:

> A "franchise" is an agreement in which the franchisee agrees to undertake certain business activities or to sell a particular type of product or service in accordance with methods and procedures prescribed by the franchiser, and *the franchiser agrees to assist the franchisee through advertising, promotion and other advisory services.* The franchise usually conveys to the franchisee a license to use the franchiser's trademark or trade name in the operation of the franchisee's business.

3 NMAC 2.1.7.5 (formerly GR 3(I)) (1969) (emphasis added). Under this regulation, a

franchise includes both a license to use the franchiser's trademark and a service component. The Legislature presumably was aware of this regulation when it re-enacted Subsection 7–9–3(I) without amendment in 1991, and we may infer from the Legislature's inaction in response to this longstanding administrative construction of the term franchise that this definition is consistent with the Legislature's intent. *See State ex rel. Stratton v. Roswell Indep. Schs,* 111 N.M. 495, 503, 806 P.2d 1085, 1093 (Ct.App. 1991).

{26} We reject Sonic's argument that the Department is required to break down a Sonic franchise into its components in determining the taxability of franchise fees. "In the field of taxation, more than in other fields, the legislature possesses the greatest freedom in classification. . . ." *Michael J. Maloof & Co. v. Bureau of Revenue,* 80 N.M. 485, 486, 458 P.2d 89, 90 (1969). We believe that for no other reason than administrative convenience, it was well within the Legislature's authority to bundle together the various components of a franchise and to classify them collectively as a form of property for purposes of the Act.

{27} In addition to conflicting with the intent of the Legislature, Sonic's approach involves an unrealistically static view of the nature of the intangible property conveyed by a Sonic License Agreement. Sonic's standard License Agreement requires Sonic franchisees to comply with the entire Sonic System. As a consequence, franchisees must rely on the Sonic System itself to adapt to changes in the market and thereby maintain whatever competitive advantage inheres in being a Sonic franchisee. The Sonic License Agreement obligates Sonic to communicate to franchisees "improvements in areas of restaurant equipment, management, food preparation and service which are pertinent to the operation of a restaurant using the Sonic System." To the extent Sonic performs services in Oklahoma or elsewhere to develop or improve the Sonic System, those services result in an upgraded Sonic System which, as we have explained earlier in this opinion, is a form of property with a situs in New Mexico. In taxing franchise fees paid by Sonic fran-

chisees, the Department is not required to unbundle costs associated with developing or improving the Sonic System.

{28} We hold that for purposes of the Act, a franchise is to be treated as a compound or "bundled" form of property, which typically includes a license to use the franchiser's trademark and a commitment by the franchiser to perform various services to assist the franchisee in the operation of the franchised business. Services that are required by the franchise agreement and any services provided by the franchiser to police, promote, maintain, or enhance the value of its franchise system, are part of the franchise for purposes of the Act, and this is so regardless of whether those services are performed in New Mexico or out-of-state (subject, of course, to any limitations imposed by the United States constitution under the standard of *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977)).

{29} Under this standard, the services described in Sonic's additional facts constituted part of a Sonic franchise as a matter of law and therefore Sonic's additional facts do not alter the taxability of the portion of franchise fee attributable to services provided to the franchisee.

### Sonic's Claim of Double Taxation

{30} Sonic argues that evidence that Sonic receives a "predetermined split of a single revenue stream on which the licensees have already fully paid New Mexico tax" precluded summary judgment in favor of the Department. According to Sonic, the manner in which its royalty fee is calculated distinguishes the present case from our decisions in *House of Carpets, Inc. v. Bureau of Revenue,* 84 N.M. 747, 507 P.2d 1078 (Ct. App.1973) and *Co–Con, Inc. v. Bureau of Revenue,* 87 N.M. 118, 529 P.2d 1239 (Ct. App.1974).

{31} *House of Carpets* involved two corporations, a retailer of wall-to-wall carpet and an installer. The retailer sold carpet, and included in the price charged to its customers the cost of installing the carpet. The installer installed the carpet, billing the

retailer. The installer paid gross receipts tax on amounts received from the retailer for installing the carpet. We upheld the imposition of gross receipts tax on the entire contract price paid to the retailer by the consumer, notwithstanding the fact that the installer paid gross receipts tax on the services required to install the carpet. We rejected the retailer's argument that imposition of gross receipts tax on the entire contract price charged by the retailer amounted to "double assessment" on the cost of installation. We held that there were two separate transactions for purposes of the Act.

{32} *Co–Con* concerned two corporations, the second corporation being a wholly-owned subsidiary of the first. Each corporation used equipment owned by the other and accounted for this usage as rentals for purposes of federal corporate income tax. We upheld the imposition of gross receipts tax on these intercorporate transactions, relying on the Act's definition of gross receipts as money received from leasing property in New Mexico. We noted that even though the same shareholders owned all the construction equipment in question, the two corporations nevertheless were separate entities for taxation purposes. *See Co–Con*, 87 N.M. at 122, 529 P.2d at 1243.

{33} We find these two cases controlling. The fact that Sonic is paid a predetermined percentage of its franchisees' gross receipts is a distinction without a difference. Sonic and its franchisees are two separate taxpayers and the sale of a franchise by Sonic and the sale of fast-food by a Sonic franchisee are separate transactions for gross receipts tax purposes.

*Effect of Misdirection of Notice of Assessment*

{34} Pursuant to Subsection 7–1–18(D), the Department was authorized to assess taxes "at any time within six years from the end of the calendar year in which payment of the tax was due." The Department prepared a notice of assessment for unpaid taxes covering six years, from December 1994 back to December 1988. On the face of the notice of assessment there are two dates:

(1) an "Assessment Date" of "11/17/95" is printed, apparently in a computer-generated typeface; and (2) a "Date of Mailing" of "11–20–95" appears in hand-written numerals. In its motion for summary judgment and supporting papers, the Department did not attempt to prove the date the notice of assessment was mailed out or otherwise establish the date from which the Department had calculated the six-year period provided by Subsection 7–1–18(D). Instead, the Department, citing Section 7–1–13, argued that the date of the written notice of assessment was immaterial because Sonic was under an independent duty of self-assessment.

{35} We disagree with the Department's assumption that a general duty of self-assessment overrides the express language of Subsection 7–1–18(D). The Legislature presumably was aware of the role of self-reporting in enforcing tax obligations, yet it nevertheless chose to enact Subsection 7–1–18(D), which cuts off civil liability in a manner analogous to a statute of limitations. Because the Department erroneously assumed that the effective date of the written assessment is immaterial, the Department did not offer any evidence establishing the effective date of notice of assessment. *See, e.g.,* NMSA 1978, § 7–1–17(B)(2) (1969, as amended through 1992). Due to the Department's failure to offer any evidence establishing the effective date of the assessment, the Department failed to make out a prima facie case of entitlement to summary judgment on the issue of the backward reach of the assessment. *See Knapp v. Fraternal Order of Eagles,* 106 N.M. 11, 13, 738 P.2d 129, 131 (Ct.App.1987). Accordingly, we affirm the district court's denial of summary judgment on this issue.

*Abatement of Penalty*

{36} Pursuant to NMSA 1978, § 7–1–69(A) (1965, as amended through 1997), the Department imposed a penalty for failure to pay tax when due. Subsection 7–1–69(A) provides:

[I]n the case of failure due to negligence or disregard of rules and regulations, but without intent to evade or defeat any tax, to pay when due any amount of tax re-

**666**

quired to be paid ... there shall be added to the amount as penalty ... two percent per month or any fraction of a month from the date the tax was due multiplied by the amount of tax due but not paid, not to exceed ten percent of the tax due but not paid....

{37} In response to the Department's motion for summary judgment as to the applicability of a penalty, Sonic submitted the affidavit of Curtis W. Schwartz, a New Mexico tax attorney who represents various clients which have resisted the imposition of gross receipts tax on grounds similar to the arguments made by Sonic. Mr. Schwartz stated his opinion that "these defenses by each of these taxpayers has a reasonable basis in both law and fact." Sonic also submitted the affidavit of Stephen C. Vaughn, a vice-president with Sonic Corp. Mr. Vaughn stated that Sonic did not pay gross receipts on "revenues attributable to payments under its license agreements" because the license agreements were executed outside New Mexico, Sonic licensees pay gross receipts on their revenues and Sonic's receipts arose in part from the performance of services outside New Mexico.

■■■ {38} A penalty may be assessed under Subsection 7-1-69(A) where the taxpayer's failure to pay gross receipts tax due and owing resulted from the taxpayer's "erroneous beliefs, inattention, inaction where action would be reasonably required, or a failure to exercise the degree of ordinary business care that similarly situated businesses would exercise." *Arco Materials, Inc. v. Taxation & Revenue Dep't*, 118 N.M. 12, 17, 878 P.2d 330, 335 (Ct.App.1994) *rev'd on other grounds by Blaze Const. Co., v. Taxation & Revenue Dep't*, 118 N.M. 647,647–48, 884 P.2d 803, 803–804 (1994). "However, where [a] taxpayer's failure to pay taxes is the result of a 'diligent protest,' and his decision to challenge the tax is based on informed consultation and advice (i.e. from his attorney or accountant), the taxpayer negates any inference of negligence and the application of the ... penalty provision is inappropriate." *C & D Trailer Sales v. Taxation & Revenue Dep't*, 93 N.M. 697, 699–700, 604 P.2d 835, 837–38 (Ct.App.1979) (citing *Stohr v. New Mexico Bureau of Revenue*, 90 N.M. 43, 559 P.2d 420 (Ct.App.1976)). Where the taxpayer ignores its tax obligations and consults with an attorney or accountant about its tax obligations only *after* an audit and assessment by the Department, such conduct is not evidence of a diligent protest and does not provide a basis for avoiding a penalty. *See Phillips Mercantile Co. v. Taxation & Revenue Dep't*, 109 N.M. 487, 491, 786 P.2d 1221, 1225 (Ct.App.1990).

■■ {39} Here, there are two relevant periods: (1) the period prior to the July 1, 1991, effective date of the amendment to Subsection 7-9-3(J), and (2) the period subsequent to the effective date of the amendment to Subsection 7-9-3(J). In view of our decisions in *AAMCO, Baskin–Robbins,* and *American Dairy Queen,* to demonstrate that it had acted reasonably, Sonic was required to come forward with evidence showing that it had consulted with tax professionals and developed compelling arguments for overruling our prior cases. For tax-periods subsequent to July 1, 1991, Sonic was required to show that its failure to report and pay tax on franchisee fees resulted from consultation with Sonic's tax counsel who had advised Sonic in the exercise of their professional judgment of a reasonable likelihood that the 1991 amendment to Subsection 7-9-3(J) would be interpreted by New Mexico courts as relieving Sonic of the duty to pay gross receipts tax on franchise fees paid to Sonic by New Mexico franchisees. The fact that Sonic eventually contacted tax counsel and that counsel was able to base a plausible argument against taxation of franchise fees on the 1991 amendment does not retroactively excuse Sonic's disregard of our prior decisions construing the Act. There is no indication in the record as to when Sonic consulted tax counsel concerning the effect of the 1991 amendment on its tax liability or what advice Sonic received from tax counsel.

{40} Sonic faced a similar burden in demonstrating that it reasonably believed that its situation was distinguishable from that of the taxpayers in *Co–Con* and *House of Carpets.*

{41} We find the conclusory and self-serving statements in the Schwartz and Vaughn affidavits insufficient to give rise to a genuine

issue of material fact as to the existence of any acceptable ground for excusing Sonic's failure to report and pay gross receipts tax as required by the Act.

## CONCLUSION

{42} As discussed under Part One, the district court properly denied Sonic's motion for summary judgment, and we therefore affirm the district court's order denying Sonic's motion for partial summary judgment. As discussed under Part Two, the district court erred by denying the Department's motion for summary judgment as to the issues of (1) the taxability of franchise fees paid by Sonic's New Mexico franchisees, and (2) the imposition of a penalty. We therefore reverse the district court's denial of the Department's motion as to these two issues. As to Sonic's entitlement to an abatement of the penalty for the period December 1988 to December 1989, there exists a genuine issue of material fact—when the notice was mailed to Sonic—and, therefore, the district court properly denied the Department's motion as to the issue of a partial abatement of the assessment. We therefore affirm the district court's denial of the Department's motion for summary judgment on the issue of abatement of assessment for the period December 1988 to December 1989.

{43} This case is remanded to the district court for further proceedings consistent with this opinion.

{44} **IT IS SO ORDERED.**

BOSSON and KENNEDY, JJ., concur.