# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>August 22, 2018</u>

**No. A-1-CA-35999**

**A&W RESTAURANTS, INC.,**

    Petitioner-Appellant,

v.

**TAXATION AND REVENUE
DEPARTMENT OF THE STATE OF
NEW MEXICO,**

    Respondent-Appellee.

**APPEAL FROM THE ADMINISTRATIVE HEARINGS OFFICE
Brian VanDenzen, Chief Hearing Officer**

Sutin, Thayer & Browne, P.C.
Stevan Douglas Looney
Justin R. Sawyer
Andrew J. Baranowski
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Peter Breen, Special Assistant Attorney General
Taxation and Revenue Department
Santa Fe, NM

for Appellee

**OPINION**

**GALLEGOS, Judge.**

{1}    A 2013 audit by the New Mexico Taxation and Revenue Department (the Department) resulted in the assessment of unpaid gross receipts tax against A&W Restaurants, Inc. (A&W), in the amount of $29,349.33. A&W protested the Department's imposition of gross receipts tax on certain trademark-related royalty fees contained within its franchise agreements with New Mexico businesses. The hearing officer granted summary judgment in favor of the Department, and A&W appeals. For the reasons that follow, we affirm.

**BACKGROUND**

{2}    A&W, an out-of-state corporation, entered into a number of franchise agreements with New Mexico businesses. Each of the franchise agreements, among other terms, contained a provision by which A&W granted to franchisees a limited license to use specific trademarks. The authority to utilize the trademarks was limited to use in connection with the operation of an A&W restaurant franchise. In consideration for the grant of the limited trademark license, the franchisees agreed to pay A&W a monthly royalty fee equal to 5 percent of gross sales.

{3}    Following an audit in 2013, the Department determined that the royalty fees for the limited trademark license were subject to gross receipts tax as money

received "from granting a right to use a franchise employed in New Mexico[.]" NMSA 1978, Section 7-9-3.5(A)(1) (2007). Consequently, the Department assessed gross receipts tax on the royalty fees in the amount of $29,349.33.[1] In response, A&W filed a tax protest with the Department, seeking an abatement of the gross receipts tax.

{4}     Pursuant to the Administrative Hearings Office Act, NMSA 1978, §§ 7-1B-1 to -9 (2015), A&W's tax protest went before a hearing officer. During the course of proceedings, A&W and the Department filed cross motions for summary judgment. A&W argued that the royalty fees it received as consideration from the limited trademark licensing provisions are exempt from gross receipts tax as a matter of law because trademarks are not considered "property" under the Gross Receipts and Compensating Tax Act (the Act), NMSA 1978, §§ 7-9-1 to -116 (1966, as amended through 2018). *See* § 7-9-3(J) (defining "property"); § 7-9-3.5(A)(1) (defining "gross receipts"). The Department, in contrast, argued that such royalty fees were taxable as receipts "from granting the right to use a franchise[.]" Section 7-9-3.5(A)(1). After hearing argument from both sides, the hearing officer disagreed with A&W's legal position and awarded summary

---

[1]The Department assessed gross receipts tax beginning on June 15, 2007, the date the 2007 amendment to Section 7-9-3.5(A)(1) became effective. The audit period at issue in this case went through December 31, 2011.

judgment to the Department. A&W appeals to this Court pursuant to NMSA 1978, Section 7-1-25(A) (2015).

**DISCUSSION**

{5}     This appeal requires us to consider the impact of two 2007 amendments to the Act on the taxability of trademark licensing royalty fees that make up part of a franchise agreement.

**I.      Standard of Review and Presumption and Burden Applicable to Tax Cases**

{6}     "Because the facts are not in dispute and the issue presented on appeal is purely legal, our review is de novo." *Fed. Express Corp. v. Abeyta*, 2004-NMCA-011, ¶ 2, 135 N.M. 37, 84 P.3d 85. Likewise, because we must engage in statutory construction, our review of the hearing officer's decision is also de novo. *See Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61 ("The meaning of language used in a statute is a question of law that we review de novo."). "In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background." *Valenzuela v. Snyder*, 2014-NMCA-061, ¶ 16, 326 P.3d 1120 (internal quotation marks and citation omitted). "Tax statutes, like any other statutes, are to be interpreted in accordance with the legislative intent and in a manner that will not render the statutes' application absurd, unreasonable, or

unjust." *City of Eunice v. N.M. Taxation & Revenue Dep't*, 2014-NMCA-085, ¶ 8, 331 P.3d 986 (internal quotation marks and citation omitted).

{7}     There exists a statutory presumption that all receipts from engaging in business in New Mexico are taxable. Section 7-9-5(A). "The taxpayer claiming that receipts are not taxable bears the burden of proving the assertion." *MPC Ltd. v. N.M. Taxation & Revenue Dep't*, 2003-NMCA-021, ¶ 12, 133 N.M. 217, 62 P.3d 308.

## II.     The Relevant Provisions of the Act

{8}     The purpose of gross receipts tax is to provide revenue for public purposes by taxing certain business activities within New Mexico. Section 7-9-2. Prior to 2007, the Legislature categorized these activities in the following ways: "selling property located in New Mexico, . . . leasing or licensing property employed in New Mexico, . . . selling services performed outside New Mexico, [and] . . . performing services in New Mexico." Section 7-9-3.5(A)(1) (2006). "[G]ross receipts" were defined as "the total amount of money or the value of consideration received" from engaging in these business activities. *Id*.

In 2007, the Legislature amended the definition of gross receipts to

> the total amount of money or the value of other consideration received from selling property in New Mexico, from leasing or licensing property employed in New Mexico, *from granting a right to use a franchise* employed in New Mexico, from selling services performed

4

outside New Mexico, the product of which is initially used in New Mexico, or from performing services in New Mexico.

Section 7-9-3.5(A)(1) (emphasis added).

{9}     Also in 2007, the Legislature amended the definition of "property" from "real property, tangible personal property, licenses, and franchises[,]" Section 7-9-3(J) (2006), to

real property, tangible personal property, *licenses other than the licenses of* copyrights, *trademarks* or patents and franchises.

Section 7-9-3(J).

### III.     Gross Receipts Tax Applies to the Trademark Licensing Royalty Fees That Are Part of A&W's Franchise Agreements

{10}     After 1991, both franchise agreements and licensing agreements were considered to be, and analyzed as, the sale of property. *See Sonic Indus., Inc. v. State* (*Sonic I*), 2000-NMCA-087, ¶ 12, 129 N.M. 657, 11 P.3d 1219, *rev'd on other grounds by Sonic Indus., Inc. v. State* (*Sonic II*), 2006-NMSC-038, ¶ 1, 140 N.M. 212, 141 P.3d 1266. However, by amending the definition of gross receipts to include the new business activity categories of licensing property employed in New Mexico and granting a franchise employed in New Mexico, Section 7-9-3.5(A)(1), the Legislature has effectively taken licensing agreements and franchise agreements out of the sale of property category. Given this development, and in light of these new categories of gross receipts, the question before us is how to

properly analyze the taxability of a limited trademark license provision contained within a franchise agreement.

{11} Unsurprisingly, A&W and the Department have differing views on the analysis to be employed, as well as on the effect that the amendments have on the taxability of the limited trademark license royalties at issue in this case. A&W asserts that gross receipts tax applies to receipts from the licensing of property and that under the new 2007 Section 7-9-3(J) definition, trademark licenses are no longer considered to be property. Based on this definitional exclusion, A&W contends that the royalty fees received as consideration from the trademark licensing provisions are exempt from gross receipts tax. Conversely, the Department maintains that the royalty fees for the limited trademark license are subject to gross receipts tax as money received from granting a right to use a franchise, pursuant to Section 7-9-3.5(A)(1).

{12} In resolving these arguments, the crucial question to be answered is whether the royalty fees flowing from this particular trademark licensing provision should be treated as being received from the grant of a franchise or from the licensing of a trademark. If we were to limit ourselves to A&W's view—that the limited trademark licensing provision is a separately-itemized standalone agreement, although contained within the franchise agreement—it would appear that the answer is clear that the royalties received from the trademark license are excluded

from gross receipts under Sections 7-9-3.5(A)(1) and 7-9-3(J). Yet, it is not so simple. We must also, as the Department contends, consider the meaning of the word "franchise." *See Valenzuela*, 2014-NMCA-061, ¶ 16, 326 P.3d 1120 ("[W]e should read the entire statute as a whole so that each provision may be considered in relation to every other part." (internal quotation marks and citation omitted)).

{13}    Although we have no statutory definition of franchise in New Mexico, this Court observed in *Sonic I* that "[b]y 1969, when the Legislature extended the Act's definition of property to 'licenses, franchises, patents, trademarks and copyrights,' the use of the term franchise to describe a prepackaged system for doing business appears to have been well established." 2000-NMCA-087, ¶ 24. This Court also set forth the following definition of a franchise:

> In its simplest terms a franchise is a license from the owner of a trademark or trade name permitting another to sell a product or service under that name or mark. More broadly stated, the franchise has evolved into an elaborate agreement under which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchiser and the franchiser undertakes to assist the franchisee through advertising, promotion and other advisory services.

*Id.* ¶ 23 (internal quotation marks and citation omitted).

{14}    We further observed in *Sonic I* that the Department had adopted a regulation defining the word "franchise":

7

A franchise is an agreement in which the franchisee agrees to undertake certain business activities or to sell a particular type of product or service in accordance with methods and procedures prescribed by the franchiser, and the franchiser agrees to assist the franchisee through advertising, promotion and other advisory services. The franchise usually conveys to the franchisee a license to use the franchiser's trademark or trade name in the operation of the franchisee's business.

*Id.* ¶ 25 (emphasis omitted); *see Black's Law Dictionary* 569 (9th ed. 2010) (defining "franchise" as "[t]o grant (to another) the sole right of engaging in a certain business or in a business using a particular trademark in a certain area"). We further held "that for purposes of the Act, a franchise is to be treated as a compound or 'bundled' form of property, which typically includes a license to use the franchiser's trademark and a commitment by the franchiser to perform various services to assist the franchisee in the operation of the franchised business." *Sonic I*, 2000-NMCA-087, ¶ 28.

{15}    We can presume that the Legislature was aware of these longstanding and undisturbed definitions of franchise in 2007 when it amended the definition of gross receipts to include "the total amount of money or the value of other consideration received . . . from granting a right to use a franchise employed in New Mexico[.]" Section 7-9-3.5(A)(1); *see Sonic I*, 2000-NMCA-087, ¶ 25 ("[W]e may infer from the Legislature's inaction in response to this longstanding

8

administrative construction of the term franchise that this definition is consistent with the Legislature's intent.").

{16}    Furthermore, we observe that the 2007 gross receipts amendment followed our Supreme Court's 2006 decision in *Sonic II*. *See* 2006-NMSC-038, ¶ 9. The Supreme Court analyzed Sonic's franchising activities under the then-current definition of gross receipts, which only included the money or value received from the sale or lease of property. *Id.* The Supreme Court first determined, in agreement with this Court's opinion in *Sonic I*, that Sonic's franchising activities constituted the sale of property. *Id.* ¶ 13. The Supreme Court went on to hold that when a franchise agreement is executed outside of New Mexico, it is considered to be an out-of-state sale, and thus not considered to fall within the definition of gross receipts. *Id.* ¶ 14. Therefore, the practical effect of *Sonic II* was to render franchise agreements with out-of-state franchisers, such as the agreement in the present case, non-taxable.

{17}    Less than a year after the *Sonic II* decision, the Legislature added a new category of business activity resulting in taxable gross receipts: granting a right to use a franchise employed in New Mexico. *See* § 7-9-3.5(A)(1). By this change, the Legislature effectively overruled *Sonic II* and restored the taxability of franchise agreements, even those entered into out-of-state, so long as they are employed in New Mexico. Nothing in the statute as amended indicates to us that the Legislature

intended to change the definition of a franchise as adopted by the Department or as laid out by this Court in *Sonic I*, or to use the word franchise in a manner unmoored from these longstanding definitions.

{18}     We are therefore not convinced that the trademark licensing provision in this case should be treated as a standalone agreement—separate and apart from the franchise—simply because it is a separate line item in the franchise agreement, as A&W urges. To the contrary, it is especially clear here in the context of a fast-food franchise that the trademark license is the heart of the franchise agreement. Consider the value of an A&W franchise in which the franchisee is not granted a license to use A&W's logos, colors, or menu items. Is such an agreement even a franchise? It certainly would bear little resemblance to a traditional franchise as commonly defined and understood. And in fact, A&W itself agreed during oral argument before this Court that a franchise of this sort would be "not entirely complete" without the trademark. In this light, we conclude that the trademark licensing provision at issue in this case is central to the overall franchise and should be treated as part of the franchise for purposes of gross receipts, regardless of whether it was separately stated and itemized in the franchise agreement.

{19}     This is consistent with the Legislature's intent, made manifest through the 2007 amendment to the definition of gross receipts, to subject franchise agreements like the one in *Sonic II* to gross receipts tax. This is also consistent

10

with the 2006 legislative amendment that added the licensing category to the definition of gross receipts. Section 7-9-3.5(A)(1) (2006). Presumably, the addition of this new category will subject certain types of licensing agreements to gross receipts tax. We acknowledge, though, as A&W has forcefully argued, trademark licenses are not considered to be property under the 2007 definition, and are therefore not taxable. This does not mean, however, that the trademark license provision at issue in this case is untaxable. The provision here is notably different from a traditional trademark license, which exists apart from a franchise agreement. *See* Irene Calboli, *The Sunset of "Quality Control" in Modern Trademark Licensing*, 57 Am. U.L. Rev. 341, 348-51 (2007) (explaining that trademark licenses generally take three forms: (1) production outsource agreements, wherein a company that normally produces a product outsources production of that product, under the trademark, to another company; (2) collateral licensing agreements, wherein a company licenses the use of its trademark to another company for use on products collateral to those traditionally produced by the licensing company; and (3) trademark promotional licensing (also known as trademark merchandising), wherein a company licenses its trademark for use on a product wholly unrelated to products originally bearing the licensed mark).

{20} We can see nothing absurd or unreasonable about subjecting trademark licensing provisions contained within a franchise to gross receipts tax, while at the

11

same time exempting standalone trademark licensing agreements, like those described above, from gross receipts tax. *See City of Eunice*, 2014-NMCA-085, ¶ 8; *cf. Michael J. Maloof & Co. v. Bureau of Revenue*, 1969-NMSC-100, ¶ 7, 80 N.M. 485, 458 P.2d 89 ("In the field of taxation, more than in other fields, the [L]egislature possesses the greatest freedom in classification[.]"). This is especially so where we have held that "a franchise is to be treated as a compound or 'bundled' form of property, which typically includes a license to use the franchiser's trademark and a commitment by the franchiser to perform various services to assist the franchisee in the operation of the franchised business." *Sonic I*, 2000-NMCA-087, ¶ 28. Our conclusion—that the Legislature intended to subject a franchise, including the bundled trademark license agreement, to gross receipts tax, while at the same time intending not to tax standalone trademark licensing agreements—harmonizes the various statutory provisions at issue here. *See Luboyeski v. Hill*, 1994-NMSC-032, ¶ 10, 117 N.M. 380, 872 P.2d 353 ("Whenever possible, we must read different legislative actions as harmonious instead of as contradicting one another.").

**CONCLUSION**

{21}　　We conclude that the Legislature's 2007 amendment to the definition of gross receipts to add money or the value of other consideration received from the grant of a franchise employed in New Mexico evidenced its intent to subject

12

franchise agreements such as the one at issue in this case to gross receipts tax, and that the taxable gross receipts include the royalties received from a limited trademark license granted as part of the franchise.

{22}  Therefore, we affirm.

{23}  **IT IS SO ORDERED**


_____
**DANIEL J. GALLEGOS, Judge**

**WE CONCUR:**


_____
**EMIL J. KIEHNE, Judge**


_____
**JENNIFER L. ATTREP, Judge**