2006-NMCA-026

131 P.3d 27

**KMART PROPERTIES, INC., a Michigan Corporation, Protestant–Appellant,**

v.

**TAXATION AND REVENUE DEPARTMENT OF THE STATE OF NEW MEXICO, Respondent–Appellee.**

**No. 21140.**

Court of Appeals of New Mexico.

Nov. 27, 2001.

Certiorari Granted, No. 27,269, Jan. 9, 2002.

Curtis W. Schwartz, Timothy R. Van Valen, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Santa Fe, for Appellant.

Patricia A. Madrid, Attorney General, Bruce J. Fort, Special Assistant Attorney General, Don Harris, Special Assistant Attorney General, Taxation and Revenue Department, Santa Fe, for Appellee.

James S. Rubin, Rubin, Katz, Salazar, Alley & Rouse, Santa Fe, Paul H. Frankel, Hollis L. Hyans, Irwin M. Slomka, Meredith L. Friedman, Morrison & Foerster, L.L.P., New York, NY, Amicus Curiae Lanco, Inc.

Mel E. Yost, Donald A. Walcott, Scheuer, Yost & Patterson, P.C., Santa Fe, Diann L. Smith, General Counsel, Stephen P.B. Kranz, Tax Counsel, William D. Peltz, Bobby L. Burgner, J. Hugh McKinnon, Chair, Vice Chair, and Counsel Lawyers' Coordinating Subcommittee, Washington, DC, Amicus Curiae Committee on State Taxation.

Paull Mines, General Counsel, Greenwood Village, CO, Frank D. Katz, Deputy General Counsel, Santa Fe, Amicus Curiae Multistate Tax Commission.

## OPINION

BOSSON, Chief Judge.

{1} Kmart Properties, Incorporated (KPI), a wholly owned Michigan subsidiary of Kmart Corporation, owns and manages trademarks previously developed by Kmart Corporation. KPI challenges New Mexico's assessment of state income taxes and gross receipts taxes upon royalties paid by Kmart Corporation to KPI. KPI bases its challenge upon the following grounds: (1) New Mexico's assertion of jurisdiction to tax KPI violates the Due Process Clause of the United States Constitution; (2) New Mexico's assessment of each tax against KPI is prohibited by the Commerce Clause of the United States Constitution; (3) New Mexico's tax on KPI's gross receipts is not authorized by state law; (4) the method for apportioning KPI's income for income tax purposes violates state law; and (5) the hearing officer was not independent and impartial, and his decision was not timely as required by state law. In affirming both taxes, we address matters of first impression regarding the constitutional limits imposed on New Mexico in its efforts to tax income and gross receipts in light of the physical-presence standard of *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (*Quill*).

## BACKGROUND

{2} In the fall of 1991 Kmart Corporation created KPI for the purpose of holding title to and managing the trademarks, trade names, and service marks (collectively referred to as the "marks") that Kmart Corporation had developed and used in the United States over the years. Those marks include such well known trade names as "Blue Light Special," and "At Home with Martha Stewart," among many others, as well as the trade name "Kmart" that appears on Kmart stores, signs, products, and employee apparel throughout the United States. When creating KPI, Kmart Corporation followed a plan, developed by Price Waterhouse, entitled "Utilization of an Investment Holding Company to Minimize State and Local Income Taxes." Under this plan, Kmart Corporation infused KPI with assets by transferring ownership of all its domestic marks and their associated goodwill to KPI, in exchange for all of KPI's stock. An independent appraiser estimated that the marks were worth between $2,734,100,000 and $4,101,200,000. Both companies were incorporated in Michigan, as were their headquarters and principal places of business. KPI rented an office suite located one block from Kmart Corporation's corporate headquarters, where KPI housed a total of five employees who were transferred from Kmart Corporation, including two intellectual property lawyers and support staff.

{3} On October 30, 1991, Kmart Corporation transferred ownership of the marks to KPI, and the two corporations entered into a licensing agreement whereby KPI granted Kmart Corporation the exclusive right to use the marks in the United States and its territories, thereby allowing Kmart Corporation the continued use of the "Kmart" name. In exchange for Kmart Corporation's exclusive right to use the marks, the licensing agreement required Kmart Corporation to make royalty payments to KPI, based on 1.1 per-

cent of Kmart Corporation's gross sales throughout the United States. The licensing agreement was negotiated, drafted, and signed by the parties in Michigan.

{4} The creation of KPI dramatically affected Kmart Corporations's tax liability within New Mexico. New Mexico income tax laws allow Kmart Corporation to take a business deduction for royalty payments made to KPI. With this deduction, Kmart Corporation was able to reduce significantly and, in some years, eliminate altogether its New Mexico income tax liability. Meanwhile, KPI paid state taxes only in Michigan, which does not tax income from royalty payments. Thus, income formerly attributed to Kmart Corporation's operations in New Mexico and taxed in New Mexico was shifted to KPI, a corporation with no formal operations in the state, which paid no state income taxes on that income.

{5} In 1997 an auditor for the New Mexico Taxation and Revenue Department (the Department) inquired about Kmart Corporation's royalty deduction, and requested from Kmart a copy of the licensing agreement. By applying the 1.1 percent royalty rate to the relevant New Mexico sales revenues, the Department determined that, during the tax assessment period, KPI earned royalty income in excess of $2,000,000 per year from conducting business within New Mexico. Using that information, the Department then audited KPI, which resulted in the assessment of income taxes and gross receipts taxes upon KPI. Assessment No. 2134646 assessed corporate income tax in the amount of $758,392, apportioned to reflect the royalty income from February 1991 through January 1996 that KPI derived from Kmart Corporation's operations in New Mexico. Assessment No. 2134647 assessed gross receipts taxes in the amount of $478,099.55 for royalty payments during this same period. Additionally, each assessment included penalties and interest for the failure to pay these taxes in a timely manner. KPI timely filed a written protest of all assessments. See NMSA 1978, § 7–1–24(B) (2000).

{6} KPI's protest was heard by a Department hearing officer who affirmed the assessment of income and gross receipts taxes plus interest, but reversed the assessment of a penalty. KPI appealed the hearing officer's decision to this Court. See NMSA 1978, § 7–1–25(A) (1989); Rule 12–601 NMRA 2001. The Department did not appeal the hearing officer's decision to eliminate the penalty.

## DISCUSSION

{7} This appeal requires us to examine whether the federal constitution prohibits New Mexico taxation of a non-domiciliary company under these circumstances.[1] A state's ability to tax a non-domiciliary company may be limited by the Due Process Clause or the Commerce Clause. See U.S. Const. art. I, § 8, cl. 3 & amend. XIV, § 1. In the past, courts analyzed these clauses with little differentiation between the two, in part because they both address a non-domiciliary company's nexus with the taxing state. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State."); cf. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) (Complete Auto Transit) (holding that a state must demonstrate that the "tax is applied to an activity with a substantial nexus with the taxing State"); Nat'l Geographic Soc'y v. Cal. Bd. of Equalization, 430 U.S. 551, 558, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977) (same). Historically, courts treated the nexus requirement of Commerce Clause jurisprudence as though it were similar, if not identical, to that found in the Due Process Clause. See Quill, 504 U.S. at 325–27, 112 S.Ct. 1904 (White, J., concurring in part and dissenting in part); Nat'l Bellas Hess, Inc. v. Dep't of Revenue, 386 U.S. 753, 756, 87 S.Ct. 1389, 18 L.Ed.2d 505

---

1. Although KPI contends that the taxes violate the New Mexico Constitution, it failed to explain why or how the Due Process Clause of the state constitution would offer more protection from state taxation than its federal counterpart. See N.M. Const. art. II, § 18. By not making an appropriate record, KPI waived the state constitutional issue. See State v. Gomez, 1997–NMSC–006, ¶¶ 21–23, 122 N.M. 777, 932 P.2d 1.

(1967) (Bellas Hess) (stating that the "same principles" of minimum contacts guide the state's power to tax under each, after observing that the two clauses share a "similar" test), *overruled on other grounds by Quill,* 504 U.S. at 301–02, 112 S.Ct. 1904; *Trinova Corp. v. Mich. Dep't of Treasury,* 498 U.S. 358, 373, 111 S.Ct. 818, 112 L.Ed.2d 884 (1991); *Memphis Natural Gas Co. v. Stone,* 335 U.S. 80, 96–97, 68 S.Ct. 1475, 92 L.Ed. 1832 (1948) (Rutledge, J., concurring).

{8}  However, in 1992 while reviewing a state's ability to impose a use tax on an out-of-state mail order company, which had no stores or sales staff in the taxing state, the United States Supreme Court held that the nexus requirements of the two constitutional clauses were distinct. *Quill,* 504 U.S. at 313–14, 112 S.Ct. 1904. After stating that "a corporation may have the 'minimum contacts' with a taxing State as required by the Due Process Clause, and yet lack the 'substantial nexus' with that State as required by the Commerce Clause," *id.* at 313, 112 S.Ct. 1904 the Court fashioned a bright-line test to determine the constitutional validity of sales and use taxes under the Commerce Clause, *id.* at 314, 112 S.Ct. 1904. To justify a sales and use tax, this bright-line test required a taxpayer's physical presence in the taxing state. *Id.* at 315–17, 112 S.Ct. 1904.

{9}  There has been a split among state courts regarding whether *Quill's* presence requirement was intended as a broad, Commerce Clause principle, applicable to all state taxes, or whether physical presence was limited to sales and use taxes. *See J.C. Penney Nat'l Bank v. Johnson,* 19 S.W.3d 831, 839 (Tenn.Ct.App.1999) (requiring physical presence beyond sales and use taxes to satisfy Commerce Clause); *cf. Geoffrey, Inc. v. S.C. Tax Comm'n,* 313 S.C. 15, 437 S.E.2d 13, 18 n. 4 (1993) (articulating the court's understanding that the physical-presence requirement is limited to sales and use taxes under

the Commerce Clause). Additionally, states have grappled with determining what satisfies *Quill's* physical-presence test for the Commerce Clause, beyond the minimum contacts of due process that are shown when a taxpayer purposefully conducts economic activity within a state. *See, e.g., J.C. Penney Nat'l Bank,* 19 S.W.3d at 840 (holding that the physical presence of 11,000 to 17,000 accounts of the bank's credit cards failed to satisfy the physical-presence requirement of the Commerce Clause under *Quill*).

{10}  In this appeal, KPI contends that neither the minimum-contacts requirement of due process nor the substantial nexus and physical-presence requirements of the Commerce Clause are satisfied with respect to either the state's income tax or its gross receipts tax. We discuss, in turn, each constitutional argument as it is applied to each tax assessed against KPI.

*Due Process Minimum Contacts Nexus*

{11}  When a state asserts its jurisdiction to tax, the Due Process Clause " 'requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' " *Quill,* 504 U.S. at 306, 112 S.Ct. 1904 (quoting *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 344–45, 74 S.Ct. 535, 98 L.Ed. 744 (1954)).[2] The fundamental concern of due process is fairness: whether a foreign corporation's contacts with the taxing state are sufficient to put the foreign corporation on notice that the taxing state will exercise power over it. *Quill,* 504 U.S. at 312, 112 S.Ct. 1904. Due process does not require that the taxpayer be physically present within the taxing state. *Id.* at 308, 112 S.Ct. 1904

{12}  KPI contends that it lacked any connection to New Mexico, and argues that its corporate business was conducted solely within the territorial boundaries of Michigan. KPI emphasizes that the licens-

---

2.  Although Due Process also requires "that the 'income attributed to the State for tax purposes must be rationally related to values connected with the taxing State,' " *Quill,* 504 U.S. at 306 (internal quotation marks and citation omitted), KPI only briefly argues the point in its reply brief, and without citation to authority. Under our briefing requirements, the issue is waived.

*See Hale v. Basin Motor Co.,* 110 N.M. 314, 321, 795 P.2d 1006, 1013 (1990) (declining to address issues raised for the first time in a reply brief); *DeMatteo v. Simon,* 112 N.M. 112, 116, 812 P.2d 361, 365 (Ct.App.1991) (holding that "arguments unsupported by authority will not be considered on appeal").

ing agreement was executed in Michigan, between two Michigan corporations, and was to be performed within Michigan. KPI arranged its corporate structure so that its employees did not leave Michigan. KPI has no tangible property or formal KPI representatives located in New Mexico, or apparently in any state other than Michigan. Accordingly, KPI argues that it does not have the minimum contacts with New Mexico that would justify the imposition of any state tax consistent with the Due Process Clause.

{13} We disagree. KPI takes a narrow view of its licensing agreement with Kmart Corporation that ignores its substance. The licensing agreement ties KPI to New Mexico, and to other states outside of Michigan where Kmart has its stores. The agreement grants to Kmart the "exclusive right, license and privilege to use the Marks *in the United States.*" (Emphasis added.) As consideration for that right, Kmart made quarterly royalty payments to KPI, calculated at 1.1 percent of the gross sales generated by the "Hardlines, Fashions and Reader's Market Divisions" from all "Kmart stores in the United States." The parties have stipulated that, at the time KPI signed the licensing agreement, Kmart owned and operated approximately twenty-two stores in New Mexico. On October 30, 1991, when Kmart transferred ownership of its marks to KPI and KPI licensed its use back to Kmart, those marks continued to be used, much as before, at the same Kmart stores in New Mexico. Certainly KPI, as owner of the marks, took no action to prevent its licensee from using the marks in New Mexico. *See Geoffrey,* 437 S.E.2d at 16 (noting that trademark licensing company had the ability to control its contact with the state by prohibiting the use of its intangible).

{14} KPI allowed Kmart Corporation to use its marks in New Mexico, in exchange for 1.1 percent of a specific revenue stream generated in New Mexico. That revenue gave KPI, as the recipient of a direct pecuniary benefit, a clear stake in New Mexico's consumer market. By allowing its marks to be used in New Mexico to generate income, KPI "purposefully avail[ed] itself of the benefits of an economic market in the forum State."

*Quill,* 504 U.S. at 307, 112 S.Ct. 1904; *see also Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. 2174 (due process is satisfied "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State"). Thus, New Mexico satisfies the traditional due process standard, which is universally used to evaluate whether an out-of-state business has established and maintained minimum contacts within a taxing state.

{15} This holding should come as no surprise to KPI. New Mexico courts have long held that the Due Process Clause permits the state to tax a foreign corporation that allows its intangible trademarks to be used in New Mexico. *See, e.g., Aamco Transmissions, Inc. v. Taxation & Revenue Dep't,* 93 N.M. 389, 392, 600 P.2d 841, 844 (Ct.App.1979) (holding that gross receipts tax on a franchise fee paid to out-of-state franchiser did not violate due process when trademarks were used in New Mexico); *Am. Dairy Queen Corp. v. Taxation & Revenue Dep't,* 93 N.M. 743, 746, 605 P.2d 251, 254 (Ct.App. 1979) (same). In a case almost identical to this one, the Supreme Court of South Carolina held that an out-of-state trademark holding company, similar to KPI, was subject to the state's taxing jurisdiction because its parent company, Toys–R–Us, used those trademarks under license in the course of its retail sales business in South Carolina. *See Geoffrey,* 437 S.E.2d at 18. The court specifically held that the tax was consistent with due process because the trademark holding company "purposefully directed its activities toward South Carolina," and because of the "presence of Geoffrey's intangible property in [the] State." *Id.* at 16, 437 S.E.2d 13. Likewise, United States Supreme Court precedent has consistently upheld the taxation of intangibles employed within the taxing state despite due process concerns. *See Int'l Harvester Co. v. Wis. Dep't of Taxation,* 322 U.S. 435, 441, 64 S.Ct. 1060, 88 L.Ed. 1373 (1944); *Wis. v. J.C. Penney Co.,* 311 U.S. 435, 450–52, 61 S.Ct. 246, 85 L.Ed. 267 (1940) (Roberts, J., dissenting); *Curry v. McCanless,* 307 U.S. 357, 365–66, 59 S.Ct. 900, 83 L.Ed. 1339 (1939); *Wheeling Steel Corp. v. Fox,* 298 U.S. 193, 209–11, 56 S.Ct. 773, 80 L.Ed. 1143 (1936).

{16} Accordingly, we hold that KPI has established and maintained sufficient minimum contacts with New Mexico to satisfy all due process concerns. This holding applies equally to New Mexico income tax and its gross receipts tax.

*Commerce Clause Substantial Nexus*

{17} As we have seen, the Commerce Clause imposes a more demanding standard than that required by due process. In the words of the United States Supreme Court, "Although [we] might suggest that every tax that passes contemporary Commerce Clause analysis is also valid under the Due Process Clause, it does not follow that the converse is as well true: A tax may be consistent with due process and yet unduly burden interstate commerce." *Quill,* 504 U.S. at 313–14 n. 7, 112 S.Ct. 1904. We turn now to that more exacting standard to determine if either the state income tax or the gross receipts tax unduly burdens interstate commerce.

■ {18} The framers of the federal constitution expressly reserved to Congress the authority to "regulate Commerce with foreign Nations, and among the several states." U.S. Const. art. I, § 8, cl. 3. In what has become known as the "negative" or "dormant" Commerce Clause jurisprudence, the Commerce Clause has been interpreted as implicitly "prohibit[ing] certain state actions that interfere with interstate commerce." *Quill,* 504 U.S. at 309, 112 S.Ct. 1904. Under the dormant Commerce Clause, state taxes that fail to meet the four-part test of *Complete Auto Transit,* 430 U.S. at 279, 97 S.Ct. 1076 interfere unconstitutionally with interstate commerce. That *Complete Auto Transit* test upholds a state tax as long as it " [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.' " *Quill,* 504 U.S. at 311, 112 S.Ct. 1904 (quoting *Complete Auto Transit,* 430 U.S. at 279, 97 S.Ct. 1076). The *Complete Auto Transit* analysis does not require physical presence in the taxing state. *Quill,* with its physical-presence standard for sales and use taxes, was decided after the Court adopted the four-part Commerce Clause test outlined in *Complete Auto Transit.* As an initial matter, we must determine whether *Quill's* physical-presence component of the Commerce Clause analysis is limited to the sales and use taxes that were at issue in *Quill,* or whether it applies to income taxes as well.

*Quill's Physical–Presence Requirement Does Not Apply to the State Income Tax*

{19} In *Quill,* 504 U.S. at 311, 112 S.Ct. 1904 the Supreme Court affirmed the Commerce Clause holding of *Bellas Hess,* 386 U.S. at 753–60, 87 S.Ct. 1389 a twenty-five-year-old opinion at the time, which held that an Illinois sales and use tax imposed upon an out-of-state mail-order company that lacked physical presence in the taxing state violated both the Due Process Clause and the Commerce Clause. *Quill* involved an interstate mail-order business similar to *Bellas Hess* whose only nexus to the taxing state was by way of interstate mails or common carrier. *Quill,* 504 U.S. at 302, 112 S.Ct. 1904. Whereas both *Quill* and *Bellas Hess* involved sales and use taxes, neither case involved a state income tax.

{20} In considering the scope of *Quill,* we turn first to the text of the opinion. The Supreme Court repeatedly emphasized a narrow focus upon sales and use taxes and the need to retain a bright-line test of physical presence for the benefit of an interstate mail-order industry that had relied upon such a test for sales and use taxes. *Quill,* 504 U.S. at 315–17, 112 S.Ct. 1904. The Court stated,

> *Bellas Hess* ... created a safe harbor for vendors "whose only connection with customers in the [taxing] State is by common carrier or the United States mail." Under *Bellas Hess,* such vendors are free from state-imposed duties to collect sales and use taxes.
>
> ... Such a rule firmly establishes the boundaries of legitimate state authority to impose a duty to collect sales and use taxes and reduces litigation concerning those taxes.....
>
> Moreover, a bright-line rule in the area of sales and use taxes also encourages settled expectations and, in doing so, fos-

ters investment by businesses and individuals . . . . .

. . . [W]e have never intimated in our review of sales or use taxes that *Bellas Hess* was unsound.

*Id.* (footnotes omitted).

{21} In that same text, the Court leaves the clear impression that it was not applying the *Bellas Hess* physical-presence requirement to any other taxes. The Court acknowledged that it had "not, in our review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes." *Quill,* 504 U.S. at 314, 112 S.Ct. 1904. The Court also stated,

[A]lthough in our cases subsequent to *Bellas Hess* and concerning other types of taxes[,] we have not adopted a similar bright-line, physical-presence requirement, our reasoning in those cases does not compel that we now reject the rule that *Bellas Hess* established in the area of sales and use taxes. To the contrary, the continuing value of a bright-line rule in this area [of sales and use taxes] and the doctrine and principles of *stare decisis* indicate that the *Bellas Hess* rule remains good law.

*Quill,* 504 U.S. at 317, 112 S.Ct. 1904. While acknowledging that "contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today," *Quill,* 504 U.S. at 311, 112 S.Ct. 1904 the Court, nonetheless, retained the physical-presence test for sales and use taxes to establish stability for a particular industry faced with the burdens of a particular kind of tax. *See id.* at 317, 112 S.Ct. 1904 ("[T]he *Bellas Hess* rule has engendered substantial reliance and . . . therefore counsels adherence to settled precedent.").

{22} It is also evident from *Quill* that a sales and use tax can impose a special burden on interstate commerce beyond just the payment of money. Unlike an income tax, a sales and use tax can make the taxpayer an agent of the state, obligated to collect the tax from the consumer at the point of sale and then pay it over to the taxing entity. Whereas, a state income tax is usually paid only once a year, to one taxing jurisdiction and at one rate, a sales and use tax can be due periodically to more than one taxing jurisdiction within a state and at varying rates. *See id.* at 313 n. 6, 112 S.Ct. 1904. Thus, collecting and paying a sales and use tax can impose additional burdens on commerce that the Supreme Court has repeatedly identified in prior opinions. *See, e.g., Nat'l Geographic Soc'y,* 430 U.S. at 558, 97 S.Ct. 1386; *Bellas Hess,* 386 U.S. at 759–60, 87 S.Ct. 1389; *Scripto, Inc. v. Carson,* 362 U.S. 207, 211, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960).

{23} New Mexico gross receipts tax is similar in structure to the sales and use tax at issue in *Quill.* New Mexico income tax is not. Considering this difference and the Supreme Court's narrow focus on the sales and use tax in *Quill,* we believe that *Quill's* physical-presence requirement was intended to apply to sales and use taxes only; it was not intended to apply to other taxes such as a state income tax. In coming to this conclusion, we join other state courts that have applied an identical rationale to uphold the constitutionality of other state taxes in a similar context. *See Geoffrey,* 437 S.E.2d at 18 (upholding the constitutionality of an income tax on royalty payments to a wholly-owned, out-of-state trademark holding company on the basis that, even after *Quill,* "the taxpayer need not have a tangible, physical presence in a state for income to be taxable there"); *Gen. Motors Corp. v. City of Seattle,* 107 Wash.App. 42, 25 P.3d 1022, 1028 (2001) (declining "to extend [*Quill's*] physical presence requirement in the context of [Seattle's business and occupation tax]"); *see also Borden Chems. & Plastics. L.P. v. Zehnder,* 312 Ill.App.3d 35, 244 Ill.Dec. 477, 726 N.E.2d 73, 80 (2000) ("The *Quill* court merely carved out a narrow exception in the area of use tax collection duties. Moreover, the court's decision was based upon considerations that have no bearing upon the facts of this case."); *cf. J.C. Penney Nat'l Bank,* 19 S.W.3d at 839 ("Both *Bellas Hess* and *Quill* are clear in their holding that in the context of a use tax, physical presence is required in order to satisfy the substantial nexus requirement of *Complete Auto.*"). We also observe that applying a physical-presence requirement to state income taxes would be a marked depar-

ture from established precedent. *See, e.g., New York ex rel. Whitney v. Graves,* 299 U.S. 366, 372, 57 S.Ct. 237, 81 L.Ed. 285 (1937); *Int'l Harvester Co.,* 322 U.S. at 441–42, 64 S.Ct. 1060. *See generally* Jerome R. Hellerstein & Walter Hellerstein, *State Taxation: Constitutional Limitations and Corporate Income and Franchise Taxes* ¶ 6.08 (3d ed.1907–2000) (stating a corporation that regularly exploits state markets should be subject to its state income tax whether or not it is physically present); Michael T. Fatale, *State Tax Jurisdiction and the Mythical "Physical Presence" Constitutional Standard,* 54 Tax Law. 105, 131 ("In general, the state court cases determine that, when a taxpayer has income derived from a state's economic market, the taxpayer is subject to that state's income tax.").

{24} Accordingly, we conclude that the Commerce Clause analysis of New Mexico income tax is controlled, not by *Quill's* physical presence, but by the overarching substantial nexus test announced in *Complete Auto Transit.* Although *Quill* did establish that "substantial nexus" under *Complete Auto Transit* has more than the minimum contacts required of due process, *Quill,* 504 U.S. at 313, 112 S.Ct. 1904 we need not quantify that difference here. In whatever manner that difference may be measured, the use of KPI's marks within New Mexico's economic market, for the purpose of generating substantial income for KPI, establishes a sufficient nexus between that income and the legitimate interests of the state and justifies the imposition of a state income tax. *See Complete Auto Transit,* 430 U.S. at 279, 97 S.Ct. 1076; *Geoffrey,* 437 S.E.2d at 18. Accordingly, we hold that the Department's assessment of state income tax on KPI's royalty revenues is not an undue burden on interstate commerce within the meaning of the United States Constitution.

*The Gross Receipts Tax Does Not Unduly Burden Interstate Commerce Where There Is Physical Presence or Its Functional Equivalent*

{25} The Department acknowledges that KPI does not have any of its own employees, operations, offices, or facilities phys-

ically located within New Mexico. Thus, this case lacks the usual indicia of physical presence described in *Quill.* If the Department is to satisfy the *Quill* standard, it must demonstrate something special about the nature of trademarks and KPI's relationship with Kmart Corporation within New Mexico that constitutes physical presence or its functional equivalent. Any such showing must also satisfy *Quill's* fundamental concern of avoiding an undue burden on interstate commerce. We also keep in mind the statutory presumption that the New Mexico Legislature intends "to extend the reach of the [Gross Receipts and Compensating Tax] Act to its constitutional limits." *Sonic Indus., Inc. v. State,* 2000–NMCA–087, ¶ 14, 129 N.M. 657, 11 P.3d 1219, *cert. granted,* 129 N.M. 519, 10 P.3d 843 (2000) (Sonic).

{26} We begin by recognizing that KPI, not Kmart Corporation, is the true owner of all of KPI's domestic marks and the goodwill represented by them, which includes the trademark name "Kmart." Ownership of those marks brings with it the complexities of trademark law and one of its abiding principles: that a trademark, and its goodwill, are inseparable property rights that, as a practical matter, are bound to the business that generates the goodwill. "Unlike patents or copyrights, trademarks are not separate property rights. They are integral and inseparable elements of the goodwill of the business or services to which they pertain." *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank,* 696 F.2d 1371, 1375 (Fed.Cir. 1982). A trade name or mark "is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes." *Marshak v. Green,* 746 F.2d 927, 929 (2d Cir.1984). "Good will and its trademark symbol are as inseparable as Siamese Twins who cannot be separated without death to both." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:2, at 18–5 (4th ed.2001).

{27} When a company acquires trademarks and goodwill, the essence of what it obtains "is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and of the sole authority to

market its products." *Levitt Corp. v. Levitt,* 593 F.2d 463, 468 (2d Cir.1979). The value of what it obtains is tied to the underlying business that generates the goodwill associated with the trademarks. "If there is no business and no good will, a trademark symbolizes nothing." McCarthy, *supra,* § 18:2, at 18–5 to 18–6. Goodwill is bound to the business with which it is associated, and "can no more be separated from a business than reputation from a person." *Id.* at 18–7 (citing *Webster Investors, Inc. v. Comm'r,* 291 F.2d 192 (2d Cir.1961)). *See generally* 1 Jerome Gilson, *Trademark Protection and Practice* § 1.03[7][b] (2001) ("Since there can be no goodwill for the trademark to symbolize without such a going business and corresponding use of the trademark, trademark rights in the United States, at least, are wholly dependent upon actual use.").

■ {28} When Kmart Corporation created KPI and transferred ownership of the "Kmart" name, it legally separated the trademark and its goodwill from the actual business upon which that goodwill depends. As a practical matter, KPI and Kmart Corporation then became, to paraphrase McCarthy, corporate "Siamese Twins," inextricably bound to each other. McCarthy, *supra,* § 18:2, at 18–5. For KPI, the trademark right to inform the public that they would have a "Kmart shopping experience" would be meaningless without access to Kmart retail outlets that actually provide that experience. Kmart Corporation, in turn, needed continued access to the trademark "Kmart" name so that it could differentiate its retail outlets from other general merchandising stores.

{29} Thus, for the mutual benefit of both companies, Kmart Corporation's retail outlets in New Mexico continued to use the KPI-owned, trademark name, "Kmart," on the storefront. According to the record below, KPI's trademark on the storefront told New Mexico citizens that they would have a "Kmart shopping experience" at that store. Upon entering a Kmart store, a New Mexico consumer will find Kmart Corporation employees bearing the trademark "Kmart" name on their store uniforms. The use of the "Kmart" name has informed customers that they will find products and services associated only with the Kmart name, such as the "Blue Light Special" and "At Home with Martha Stewart," a shopping experience that, because of KPI's marks, could only happen within the confines of a "Kmart" store.

{30} The use of KPI's marks in this fashion has allowed Kmart Corporation to personify the goodwill owned by KPI to facilitate merchandise sales in New Mexico. In this manner, Kmart employees, wearing KPI's trademarks and working at stores with KPI's trademark on the marquee, have acted to represent and promote the goodwill of KPI's marks to the New Mexico consuming public. The value of that goodwill in New Mexico depended, at least to some extent, on how well or how poorly those employees and products performed in New Mexico. Kmart customers, of course, have had no way of knowing that they were dealing with representatives of KPI's goodwill; apparently few people were actually aware that KPI, and not Kmart Corporation, owned the marks and associated goodwill. But, nonetheless, the use of those marks in New Mexico by Kmart Corporation employees promoted the good business reputation associated with KPI's property.

{31} The licensing agreement further demonstrates that Kmart Corporation represented KPI's goodwill in New Mexico by requiring Kmart employees, at least in some form, to act on behalf of KPI's interests. Under the licensing agreement, Kmart Corporation's use of the "Kmart" name was to be "consistent with the high standards of quality and excellence established over the years." The licensing agreement obligated Kmart Corporation to refrain from activities that would "injure or diminish the image or reputation" of KPI's goodwill. More to the point, to ensure that Kmart Corporation would "maintain and enhance the goodwill and image of quality associated by the public with the Marks," Kmart Corporation could only use the "Kmart" name on "establishments maintaining a good business reputation." Kmart Corporation could not use the trademark name in association with "any illegal, vulgar, obscene, immoral, unsavory or

offensive activities." Thus, this licensing agreement empowered KPI to dictate a standard of conduct that governed Kmart's employees in New Mexico, so that Kmart stores could maintain a good business reputation in the local community.

{32} The Department argues that the use of Kmart Corporation stores and employees in New Mexico, to represent KPI's goodwill, gives KPI a "physical presence" in New Mexico under the analysis of *Tyler Pipe Industries, Inc. v. Washington Department of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) (Tyler Pipe) and *Scripto,* 362 U.S. at 211, 80 S.Ct. 619. In each of these cases, the United States Supreme Court upheld the constitutionality, under the Commerce Clause, of state sales or use taxes imposed on out-of-state companies that did business in the taxing state *solely* through independent representatives. These representatives were local people who were *not* employees or agents of the taxpayer. In each case, the out-of-state taxpayers had *none* of their own employees or facilities in the taxing state. The Supreme Court considered sufficient, for Commerce Clause purposes, the physical presence of local jobbers, wholesalers, and independent contractors who assumed the job of promoting or aiding the taxpayers' interests within the taxing state. *See Tyler Pipe,* 483 U.S. at 251, 107 S.Ct. 2810 (holding that "the activities of Tyler's sales representatives adequately support the State's jurisdiction to impose its wholesale tax"); *Scripto,* 362 U.S. at 209, 80 S.Ct. 619 (finding that each independent sales representative was engaged as "a representative of 'Scripto' ").

{33} Importantly, the Supreme Court regarded the label or technical legal status of the representative within the taxing state as "without constitutional significance." *Scripto,* 362 U.S. at 211, 80 S.Ct. 619. What mattered was a physical presence, within the taxing state, of someone acting on the company's behalf. Even though *Scripto* and *Tyler Pipe* preceded *Quill,* the Supreme Court in *Quill* reconfirmed that the presence of independent representatives within the taxing state satisfies the physical-presence test. *Quill,* 504 U.S. at 314 (observing that cases such as *Tyler Pipe* "involved taxpayers who had a physical presence in the taxing State" through local independent representatives).

{34} *Tyler Pipe* and *Scripto* provide a close analogy for purposes of analyzing Commerce Clause concerns and physical presence. As the Department argues, the record below supports a conclusion that Kmart Corporation used its stores and employees in New Mexico as local representatives of KPI's goodwill, under a licensing agreement with KPI, to promote both its own sales and the goodwill of KPI's marks. However, there is a difference. Unlike *Tyler Pipe* and *Scripto,* KPI is not engaged in the retail sales of a product. Its sole function is to hold title to marks and associated goodwill that are under license to Kmart Corporation. The question is whether this distinction, with respect to the kind of business and the nature of the intangible property interests being promoted, requires any different result. We think not.

{35} Being intangible property, a trademark can only have "physical presence," beyond the state of its creation, in those locales where it is put to tangible use. *See Geoffrey,* 437 S.E.2d at 17–18. When Kmart Corporation uses KPI's marks in a highly visible and commercially purposeful fashion in New Mexico, it logically follows that those marks are physically present during their period of use. Otherwise, trademarks could never be physically present anywhere other than where the taxpayer designates for its own tax purposes. *See id.* (rejecting similarly restrictive argument regarding use of intangible trademarks in taxing state). The Constitution does not impose such a taxpayer-driven restriction on New Mexico's taxing policy. *See Sonic,* 2000–NMCA–087, ¶ 13, 129 N.M. 657, 11 P.3d 1219; *Am. Dairy Queen Corp.,* 93 N.M. at 746, 605 P.2d at 254.

{36} KPI counters that, if we attribute physical presence for Commerce Clause purposes, based *solely* on the tangible manifestation of KPI's marks in New Mexico, then the State's taxing jurisdiction would become boundless. KPI poses a hypothetical dilemma that any out-of-state third-party, such as a national book author or a holding company for the trademarks of an international sports

or entertainment personality, would have to pay gross receipts tax to New Mexico simply for allowing its trademark to appear on products held for sale on Kmart's shelves. Under that hypothetical, New Mexico would be allowed to extend its reach to tax the out-of-state author for each book sold and the international sports star for each pair of sports paraphernalia sold in a Kmart store without any other connection to this state. KPI contends that this would be gross overreaching on the state's part without precedent anywhere in the country.

{37} We agree that such a result would be unprecedented. However, we disagree that our opinion opens the door to any such hypothetical tax. We have no indication on this record that New Mexico intends to impose its gross receipts tax upon national book authors or sports celebrities merely because merchandise bearing their trademark names is sold in New Mexico stores. We emphasize that we do not decide such a question in the abstract.

{38} The case before us presents far more than just merchandise bearing out-of-state trademarks for sale in New Mexico stores. An extensive apparatus of Kmart stores, signs, and employees are also physically present in New Mexico to work on behalf of KPI's goodwill and associated interests. That apparatus represents KPI's property interests in New Mexico, pursuant to a licensing agreement that requires Kmart Corporation to act on KPI's behalf.

{39} Considering the *Quill* standard in the context of this case, we conclude that the combination of Kmart Corporation's activities in New Mexico, together with the tangible presence of KPI's marks, constitutes the functional equivalent of physical presence as afforded by the independent representatives in *Scripto* and *Tyler Pipe*. As the Supreme Court implicitly acknowledges in the *Quill* opinion, by citing *Scripto* in the context of its physical presence discussion, an independent representative present in the taxing state satisfies the physical presence test and Commerce Clause concerns. *Quill*, 504 U.S. at 314. Here, as in *Tyler Pipe*, Kmart employees were instrumental in " 'maintain[ing] and improv[ing]' the name recognition, market

share, goodwill, and individual customer relations' " associated with valuable property owned by KPI. *Tyler Pipe*, 483 U.S. at 249, 107 S.Ct. 2810.

{40} We also note that the gross receipts tax in this instance appears to be less of a burden on interstate commerce than the use tax in *Quill*. Because KPI is not engaged in retail sales, it does not have to collect a separate tax from each consumer and then pay it at varying rates according to each local governmental entity in which it is present. As we have previously noted, KPI pays one tax, at a uniform rate, to a single entity based solely on the royalty payment from Kmart Corporation to KPI. This is significantly different from the burden threatened in *Quill* upon the interstate mail-order industry.

{41} KPI also contends that Kmart Corporation cannot be a representative of KPI because Kmart Corporation sells general merchandise, whereas KPI sells only trademarks. Yet, the licensing agreement undercuts this claim. Having granted Kmart Corporation "the exclusive right, license and privilege to use the Marks in the United States," KPI no longer has the capacity to sell its trademarks in the United States. KPI's business purpose, under the terms of the licensing agreement, is to pursue the "further protection and enhancement of its uniquely valuable trademarks and service marks." In other words, KPI is in the business of protecting the goodwill and reputation of the "Kmart" name. This includes ensuring that New Mexico's consumers can continue to rely on the quality that the "Kmart" name has come to represent. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir.1959).

{42} For purposes of clarity, we wish to emphasize that our holding today does *not* make Kmart Corporation or any of its employees the agents of KPI, and it does *not* purport to establish a legal relationship of agency, respondeat superior, or premises liability. *See Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1327 (7th Cir.1979). Nothing in this opinion should imply vicarious liability in KPI for the tortious acts of Kmart Corporation and its personnel. *See Ciup v. Chevron*

*U.S.A., Inc.,* 1996–NMSC–062, ¶ 8, 122 N.M. 537, 928 P.2d 263. As the Supreme Court emphasized in *Scripto,* representatives for purposes of establishing Commerce Clause physical presence do not need legal authority to bind the out-of-state taxpayer, contractually or otherwise. *Scripto,* 362 U.S. at 209, 80 S.Ct. 619 (noting that orders collected by the sales representatives were sent "directly to the Atlanta office for acceptance or refusal").

*Imposition of the Gross Receipts Tax Upon KPI Is Authorized By Statute*

{43} KPI challenges the statutory foundation for the state to tax its royalties received from Kmart Corporation as gross receipts under New Mexico law. NMSA 1978, Section 7–9–3(F) (2001) of the Gross Receipts and Compensating Tax Act authorizes the State to impose gross receipts tax on "the total amount of money or the value of other considerations received from selling property in New Mexico." Section 7–9–3(J) of the same Act provides that "the granting of a license to use property is the sale of a license." *Accord Sonic,* 2000–NMCA–087, ¶ 7, 129 N.M. 657, 11 P.3d 1219. Based on these statutes, the State imposes its tax upon the royalties KPI received from KPI's grant of a license to Kmart Corporation to use KPI's marks and associated goodwill within New Mexico.

■ {44} KPI argues that New Mexico is without jurisdiction to impose this tax, and the statute could not have intended such a result because the grant of license occurred in Michigan, not in New Mexico. However, in *Sonic* we rejected a similarly formalistic, place-of-contracting argument. *Id.* ¶ 14. In that opinion, we interpreted the same tax statute "to reinforce the requirement that the activities generating receipts subject to taxation under the Act must have a sufficient nexus with New Mexico to support taxation by New Mexico." *Id.* We held that the act of licensing intangible trademarks from an out-of-state franchiser to a New Mexico franchisee to be used in this state constituted "selling property *in* New Mexico" with sufficient nexus to be subject to New Mexico gross receipts tax. *Id.* ¶ 15.

{45} KPI concedes that *Sonic* is determinative of this argument as a matter of state law, and urges us to reconsider that decision. We decline to do so. To the contrary, we follow the rationale of *Sonic* and hold that the gross receipts statute authorizes the State to tax KPI's royalties generated in New Mexico as consideration for the grant (sale) of a license to Kmart Corporation to use those marks in New Mexico.

*Apportionment of KPI's Income for Income Tax Purposes Based on Income Generated From Use of the Marks in New Mexico Complies With State Law*

■ {46} KPI files an additional protest against the state income tax on the ground that the tax is not properly apportioned between this state and Michigan as provided by New Mexico law. KPI relies on the Uniform Division of Income for Tax Purposes Act (UDITPA), NMSA 1978, §§ 7–4–1 to –21 (1965, as amended through 2001), a widely-used, uniform system of apportioning and allocating the income of taxpayers who operate in multiple states. In an effort at fair and uniform allocation of taxable income among the states, UDITPA apportions business income among the states based upon the amount and location of three factors regarding the taxpayer's business: real and tangible personal property, employee payroll, and sales. *See* §§ 7–4–10, –11, –14, –16.

{47} It is undisputed that KPI has no real or tangible personal property in New Mexico nor any employees, and it is also settled that KPI never consummated any of its own sales in New Mexico. Therefore, KPI argues that application of the UDITPA formula should result in none of its income being subject to tax in New Mexico and all of its income subject to tax in Michigan. In short, KPI charges that the State of New Mexico is breaking faith with a kind of national compact by imposing its income tax on revenues that should rightly be taxed elsewhere.

{48} The Department responds by citing to Section 7–4–19, a section of UDITPA that allows New Mexico, as with other states, to modify an apportionment formula that "do[es] not fairly represent the extent of the

taxpayer's business activity in this state." That section reads,

### 7–4–19 Equitable adjustment of standard allocation or apportionment.

If the allocation and apportionment provisions of [UDITPA] do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for, or the department may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

> A. separate accounting;
>
> B. the exclusion of any one or more of the factors;
>
> C. the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or
>
> D. the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

{49}   The Department specifically relied upon Section 7–4–19 to fashion a modified formula that would fairly represent the extent of KPI's "business activity" in New Mexico. The Department applied the sales factor, finding that KPI had a business presence in New Mexico directly related to Kmart's use of KPI's marks and goodwill to produce a revenue stream of sales from New Mexico's markets that translated into royalties paid to KPI. However, the Department excluded the property and payroll factors from the formula pursuant to Section 7–4–19(B), because those factors were de minimis compared to the sales factor in both amount and significance in terms of KPI's business activity. The Department concluded that property and payroll played little or no role in how KPI generated its income, and that inclusion of those factors would distort the economic reality of KPI's business presence.

{50}   KPI objects that Section 7–4–19 should be used only under unusual circumstances, and that the Department is simply changing the rules to unfairly increase its revenues. KPI also cites out-of-state case law for the universally accepted propositions that UDITPA, Section 7–4–19, should be used sparingly and that the Department has

a heavy burden of persuasion to justify any modification of the UDITPA formula. *See Roger Dean Enters., Inc. v. Dep't of Revenue,* 387 So.2d 358, 363 (Fla.1980); *Donald M. Drake Co. v. Dep't of Revenue,* 263 Or. 26, 500 P.2d 1041, 1044 (1972) (in banc).

{51}   We agree that, by definition, modification of the standard formula should be the exception, not the rule. However, we are also aware that the Department did establish a case below to carry its burden in support of exceptional circumstances. The Department presented evidence sufficient to persuade the hearing officer that use of the standard formula in this instance "distorts" the economic reality of KPI's income. The hearing officer concluded that, "[i]n this case, the Department has met its burden of proving that the three-factor formula does not fairly represent KPI's business activity in the state." Although there was evidence on both sides of the proposition, the hearing officer's conclusion finds support in the evidentiary record. It also has support in case law and treatise materials. *See, e.g., Twentieth Century–Fox Film Corp. v. Dep't of Revenue,* 299 Or. 220, 700 P.2d 1035, 1043 (1985) (in banc) (describing criteria for adjustment of UDITPA formula); Hellerstein, *supra,* ¶ 9.09[4], at 9–44 (suggesting that attribution of income to the place where the intangible asset is being exploited would be "likely to reflect, realistically and equitably, the legitimate competing claims of the states involved in the taxation of income").

{52}   The hearing officer's determination is also supported by a Department regulation, adopted in 1974 pursuant to Section 7–4–19, providing that where the income producing activity producing business income from intangibles can be readily identified, that income should be sourced to that state and not the state with the greatest cost of production. *See* 3 NMAC 5.19.11(A)(3). Application of that regulation and Section 7–4–19 to the specific circumstance of taxing KPI's royalties generated in New Mexico is supported, in this case, by an amicus curiae brief from the Multistate Tax Commission, "the organization primarily responsible for promoting uniformity of taxation in member states." *Twentieth Century–Fox Film*

*Corp.,* 700 P.2d at 1041. Finally, even with the adjusted formula, it bears repetition that New Mexico is only taxing revenues (royalties) from sales attributable to New Mexico; the Department is not trying to tax income generated beyond its borders. We conclude that the Department sustained its burden to justify a modified formula under Section 7–4–19.

*Additional Procedural Issues*

■ {53} KPI raises two procedural issues with which we deal summarily. First, KPI points out that the Department hearing officer took almost a year to decide its administrative protest of these tax assessments. KPI cites to language in the Tax Administration Act providing that "[i]n the case of the hearing of any protest . . . [t]he hearing officer, within thirty days of the hearing, shall inform the protestant in writing of the decision." *See* § 7–1–24(H). Both parties agree that the decision was rendered far longer than thirty days from the hearing. KPI now claims on appeal that the thirty-day requirement is jurisdictional, such that the hearing officer lost power to render his decision and the resulting decision is void. KPI cites two jurisdictional New Mexico opinions interpreting a provision in the Uniform Licensing Act, NMSA 1978, § 61–1–13(B) (1993), that a licensing revocation "decision must be rendered and signed within ninety days after the hearing." *See Lopez v. N.M. Bd. of Med. Exam'rs,* 107 N.M. 145, 145–47, 754 P.2d 522, 522–24 (1988); *Foster v. Bd. of Dentistry,* 103 N.M. 776, 776–78, 714 P.2d 580, 580–82 (1986).

{54} The Uniform Licensing Act is not a tax statute, and does not carry with it the presumption of correctness and burden of persuasion that favors the state in tax matters. *See* NMSA 1978, § 7–1–17 (1992). We have previously construed a similar portion of the Tax Administration Act requiring that a hearing officer "shall promptly set a date for hearing." Section 7–1–24(D). In *In re Ranchers–Tufco Limestone Project Joint Venture,* 100 N.M. 632, 635, 674 P.2d 522, 525 (Ct.App.1983), we declined the kind of relief KPI requests here and held that "[t]he general rule is that tardiness of public officers in the performance of statutory duties is not a defense to an action by the state to enforce a public right or to protect public interests."

{55} We think the same is true of the Tax Administration Act. We hold that the thirty-day requirement for a hearing officer decision does not affect "the essential power" of the hearing officer to decide complex and time-consuming tax protests of this magnitude. In addition, KPI has shown no prejudice from the delay that would affect the merits of the issues it raises in its protest and on this appeal.

■ {56} KPI's second procedural issue is an attack on the Department hearing officer and the administrative hearing process. KPI alleges that the hearing process did not afford it an objectively fair and impartial forum, and that there was an objective indication of bias or prejudice in the process. *See Reid v. N.M. Bd. of Exam'rs,* 92 N.M. 414, 416, 589 P.2d 198, 200 (1979). KPI makes several factual allegations, including allegations that hearing officers are "captives" of the Department. KPI alleges that the officers are employees of the Department and answer to Department supervisors, that the hearing officer used arguments and took positions outside the parameters of the hearing without affording the parties fair notice, and that the hearing officer cooperated with and assisted the Department attorneys outside the record and in a manner unknown to KPI. KPI also relies upon the alleged fact that tax protesters always lose before the Department hearing officer.

■ {57} We have dealt with some of these arguments in prior opinions, and we need not re-plow old ground here. *See TPL. Inc. v. N.M. Taxation & Revenue Dep't,* 2000–NMCA–083, ¶ 19, 129 N.M. 539, 10 P.3d 863 (rejecting argument that hearing officer did not provide a fair hearing and that she demonstrated bias by, among other things, searching through the record to come to her own conclusions outside of the arguments of the parties), *cert. granted,* 129 N.M. 519, 10 P.3d 843 (2000). Other arguments are simply too fact-based for this Court, or any appellate court, to adjudicate without a developed record below. Most of KPI's positions on this subject were not sufficiently devel-

oped before the hearing officer. It is well-established that due process is not violated by having hearing officers who are employed by an agency adjudicating cases in which that agency is a party. *C & D Trailer Sales v. Taxation & Revenue Dep't*, 93 N.M. 697, 700, 604 P.2d 835, 838 (Ct.App.1979). We note that any tax protestor can avoid the hearing process altogether by electing to pay the tax assessed and filing a refund claim with the district court. *See* NMSA 1978, § 7–1–26(C)(2) (2001).

{58} We acknowledge that some of KPI's allegations, such as that of ex parte relations between department hearing officers and other department employees, do raise issues of particular note with at least the potential for conflict. Notwithstanding the absence of an adequate record that precludes us from deciding these factual issues on appeal, the Department might be well-advised, if only out of an abundance of caution, to pay more heed to appearances created when department hearing officers and department attorneys and employees are all housed, figuratively and literally, under one roof. With that observation, we reject KPI's arguments on this point as well.

## CONCLUSION

{59} We affirm the decision and order of the hearing officer upholding the taxes imposed.

{60} **IT IS SO ORDERED.**

WECHSLER and CASTILLO, JJ., concur.