UNITED CHURCH OF RELIGIOUS SCIENCE *vs.* BOARD OF ASSESSORS OF ATTLEBORO
(and a companion case between the same parties).

Suffolk.    January 5, 1977. — April 1, 1977.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Taxation,* Personal property tax: exemption. *Religious Organization. Statute,* Construction, Revision.

In order for personal property to be exempt from taxation under G. L. c. 59, § 5, Tenth, both the property and income therefrom must be used for religious purposes. [284-286]

APPEAL from a decision of the Appellate Tax Board.
*William G. Young (John H. Ashby* with him) for the United Church of Religious Science.
*Max Volterra* for the Board of Assessors of Attleboro.

QUIRICO, J.    These cases present the issue whether personal property owned by a religious organization and used by it to operate a commercial cable and wire manufacturing business is exempt from local property taxation under G. L. c. 59, § 5, Tenth. We hold the property to be taxable.

The United Church of Religious Science (church) appeals under G. L. c. 58A, § 13, from a decision of the Appellate Tax Board (board) upholding the refusal of the board of assessors of Attleboro to abate taxes on certain personal property for the six-month period ending June

30, 1974, and the year ending June 30, 1975.[1] The cases were consolidated for trial and appeal.

There is no serious dispute about the facts and, in any event, under G. L. c. 58A, § 13, the decision of the board is final as to findings of fact. *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth,* 368 Mass. 745, 749-750 (1975). *Coomey* v. *Assessors of Sandwich,* 367 Mass. 836, 839 (1975), and cases cited. *Assessors of Hamilton* v. *Iron Rail Fund of Girls Clubs of America, Inc.,* 367 Mass. 301, 302 (1975), and cases cited.

We summarize the facts found by the board. The church is a nonprofit corporation organized under the laws of California. In the language of its articles of incorporation, "the specific and only purposes of this corporation are: (a) to maintain and operate a church of Religious Science for worship and religious teachings according to the principles of Religious Science as expressed by Ernest Holmes. (b) to engage in religious and charitable activities connected therewith; and, more specifically stated, to provide religious education, information, advice and training in relation to religious science and related religious subjects; to conduct religious services and to perform any and all religious functions. (c) to render such services and do such other lawful acts and things as may be deemed necessary for the accomplishment or furtherance of, or in connection with the foregoing purposes . . . ."

The church has approximately 40,000 members. The congregation of the founder's church in Los Angeles has 7,700 members; the remaining members belong to about 100 affiliated churches and twenty-seven study and fellowship groups located in nineteen States. There are no churches in Massachusetts. The church's religious activities include worship services, meetings of religious science practitioners, operation of the Institute of Religious Sci-

---

[1] The controversy is limited to this period. At oral argument we were informed that the church has subsequently received an exemption from local property taxes for the property in issue as a manufacturing corporation under G. L. c. 59, § 5, Sixteenth. See *Fernandes Super Mkts., Inc.* v. *State Tax Comm'n,* 371 Mass. 318 (1976).

282                                                372 Mass. 280

United Church of Religious Science *v*. Bd. of Assessors of Attleboro.

ence, operation of a nonprofit elementary school and a school of ministry, publication of a monthly magazine, "Science of Mind," and distribution of a study course in religious science and a variety of religious tracts and publications.

The church purchased the stock of several California corporations to obtain income for its various activities. These corporations were dissolved and their assets were distributed to the church. The church operates the business formerly conducted by these corporations as an investment asset through a division of the church known as Standard Wire and Cable Co. (Standard Wire). The income of Standard Wire is utilized for the expenses of religious programs and for reinvestment in the business. In 1974, the total assets of the church were approximately $8,931,649, of which Standard Wire accounted for $3,841,-034. The total revenues for 1974 were $3,104,065, of which Standard Wire's net earnings amounted to $1,367,469.

Since 1967, Standard Wire has operated a plant in Attleboro, Massachusetts, which manufactures electrical wire and cable for commercial and industrial purposes. Personal property at the plant, consisting of machinery and stock in trade, is the subject matter of these appeals. The parties stipulated and the board found that the fair market value of this property was $750,000 for the years in question. The parties also stipulated and the board found that the church was at all relevant times the owner of the property.

The board found that "although the net income from the operation of the Standard Wire Division in Attleboro was used for 'church' purposes, the property in question and the use of said property was not involved in 'church' purposes.... [T]he purpose of the Standard Wire Division ... was commercial in character and was not related to the 'church's' religious activity." The board further found that the personal property involved was not "used or appropriated for religious ... purposes" within G. L. c. 59, § 5, Tenth. The board concluded that "[i]nsofar as it is a question of fact, ... the subject property is not exempt from taxation ...."

The only question presented by these appeals is whether the facts found by the board required a decision that the property was exempt.

General Laws c. 59, § 5, Tenth (originally enacted by St. 1918, c. 106, § 1), now provides that the following property shall be exempt from taxation: "Personal property owned by or held in trust within the commonwealth for religious organizations, whether or not incorporated, if the principal or income is used or appropriated for religious, benevolent or charitable purposes." There is no dispute that the church is a religious organization,[2] that the church owns the property, and that the income generated by the property is used for religious purposes.[3]

The controversy separating the parties, and the basis for the appeals, is whether the statute requires the property itself to be used for religious purposes to qualify for the exemptions, or whether the religious use of the income generated by the property is sufficient. The church contends that "the Board changed the statutory requirement that 'the principal *or* income' from the property be used for religious purposes into a requirement that both the principal *and* the income must be used for religious purposes." The assessors reply that the statute "require[s] that the personal property itself be used for religious purposes, and not just the profit from it." Both parties seek support from *Assessors of Boston* v. *Lamson*, 316 Mass.

[2] While the parties agree that the church is a religious organization within the meaning of G. L. c. 59, § 5, Tenth, the board refused to grant the church's request for a ruling of law to that effect. This refusal was based solely on the board's conclusion that the operation of Standard Wire "is not related to the church's religious activities," and not on any doubts about the bona fides of the church's devotion to religious purposes.

[3] The parties agreed and the board found that the church used the income from the property for religious purposes. The church argues that, "under established principles of trust law, . . . if the income is used for religious purposes, the principal used to generate such income is also used for such purposes . . . [and] [t]his, without more, should end the case in favor of the Church." This proposition is unsupported by any citation to legal authority.

166 (1944), the only case in which this court has previously interpreted the scope of this exemption.

The *Lamson* case involved the assessment of a $37,000 tax on property, including machinery, furniture, fixtures, and printing supplies, valued at $1,000,000, which was owned by the trustees of The Christian Science Publishing Society, and used for the publication of numerous religious periodicals, books and pamphlets, and a daily newspaper, The Christian Science Monitor. The assessors challenged the board's rulings that the property in question and the income from the property were used or appropriated for religious purposes. The court held that the board's findings were warranted by the facts and that the exemption was proper.

The major question in the *Lamson* case was whether a dominant, but not exclusive, use of property for religious purposes would suffice for the exemption. *Id.* at 173. The court held that a dominant religious purpose was sufficient. This resolution of the characterization problem — that is, whether the property was used for religious purposes — does not help us in our present inquiry. Indeed, since the court in the *Lamson* case sustained the board's findings that both the property and the income were used for religious purposes, any views expressed about the independent sufficiency of religious use of either the property or the income would have been unnecessary to that decision.

Upon our examination of the history and purpose of G. L. c. 59, § 5, Tenth, we conclude that both the property and the income therefrom must be used for religious purposes for the exemption to apply. The original enactment, St. 1918, c. 106, § 1, provided as follows: "Personal property owned by or held in trust within the commonwealth for religious organizations, whether or not incorporated, shall be exempted from taxation ... and the income derived therefrom shall not be taxable...: *provided, that such property is used* and *such income is used or appropriated for religious, benevolent or charitable purposes*" (emphasis added).

The use of the word "and" in the original enactment

suggests a legislative intent that both the principal and the income must be devoted to religious purposes to render the property exempt.

The verbal change of "and" to "or" which occurred in the codification of the General Laws of 1921, G. L. c. 59, § 5, Tenth, does not change the original meaning. There is nothing to indicate any intent of the Legislature to amend or alter the original enactment. No reference to any such intention is found in any of the reports of the Commissioners for the consolidation of the General Laws. The text as it now appears first appeared in the draft submitted by the Commissioners in their 1920 report, with the word "or" in place of "and." The Commissioners gave a marginal reference to St. 1918, c. 106, § 1. No note was appended to c. 59 to indicate any intended change in § 5, Tenth, although it was the stated practice of the Commissioners to indicate verbal corrections by notes appended to the end of each chapter. Report of the Commissioners to Consolidate and Arrange the General Laws (1920), vol. I, at 2. There is thus no evidence of any intention on the part of the Legislature to amend or alter the meaning of St. 1918, c. 106, § 1, by the change in wording in the codification of G. L. c. 59, § 5, Tenth.

In *Medford Trust Co.* v. *McKnight*, 292 Mass. 1, 28 (1935), we said: "The general revision of the statutes in General Laws is to be construed as continuing the previous law since in the respects here material no change is indicated." In *Old Colony Trust Co.* v. *Commissioner of Corps. & Taxation*, 331 Mass. 329, 334 (1954), we spoke of the commonly accepted principle of statutory construction that " '[a] general revision of statutes does not ordinarily change the effect of earlier provisions, but is to be construed as a continuation of them in the absence of some plain indication of a legislative intent to alter the law. *Mackintosh, petitioner*, 246 Mass. 482 [1923], and cases there collected.' *Byfield* v. *Newton*, 247 Mass. 46, 56 [1923]. *Worcester County National Bank* v. *Commissioner of Corporations & Taxation*, 275 Mass. 216, 218 [1931]." See *Town Crier, Inc.* v. *Chief of Police of Weston*, 361

Mass. 682, 686 (1972), and cases cited. 1A Sutherland, Statutory Construction (Sands 4th ed. 1972) § 28.10.

We are persuaded that the verbal change from "and" to "or" in the circumstances of these cases did not change the meaning of the statute. "Taxation is the general rule, and exemption is the exception." *Sylvester* v. *Assessors of Braintree*, 344 Mass. 263, 264 (1962). We have previously stated "the principle that the burden is upon a taxpayer to show clearly and unequivocally that its property is exempt from the tax . . . ." *Workmen's Circle Educ. Center of Springfield, Inc.* v. *Assessors of Springfield*, 314 Mass. 616, 621 (1943), and cases cited. *Jacob's Pillow Dance Festival, Inc.* v. *Assessors of Becket*, 320 Mass. 311, 312-313 (1946). Because the claimed exemption is governed by the language of our particular statute, decisions reached by other jurisdictions bear only incidentally on the problem in these cases. Nonetheless, our decision seems to accord with the weight of authority. See Annot., 154 A.L.R. 895 (1945); Annot., 168 A.L.R. 1222 (1948). Cf. Van Alstyne, Tax Exemption of Church Property, 20 Ohio State L.J. 461 (1959). For these reasons, we affirm the board's decision that the property was not used for religious purposes and therefore was not exempt.

*So ordered.*