# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

CAPITAL ONE BANK & another[1] vs. COMMISSIONER OF
REVENUE.

Suffolk. October 7, 2008. - January 8, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Administrative Law,* Substantial evidence. *Taxation,* Bank excise tax; Appel-
late Tax Board: appeal to Supreme Judicial Court. *Constitutional Law,*
Taxation, Commerce clause, Interstate commerce. *Bank. Words,* "Substan-
tial nexus," "Physical presence."

The Appellate Tax Board correctly affirmed the denial by the Commissioner
of Revenue of applications by taxpayers (an out-of-State credit card bank
and an out-of-State federally chartered savings bank) for the abatement of
a financial institution excise tax imposed pursuant to G. L. c. 63, § 2,
where the imposition of such an income-based tax was consistent with the
commerce clause of the United States Constitution, despite the taxpayers'
lack of physical presence in the Commonwealth, as the taxpayers' activi-
ties (including the provision of valuable financial services to Massachusetts

[1]Capital One F.S.B.

consumers, for which the taxpayers obtained significant compensation, and which required the use of banking and credit facilities in the Commonwealth) established a substantial nexus with the Commonwealth during the tax years at issue. [8-16]

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*John S. Brown* (*Matthew D. Schnall & Donald-Bruce Abrams* with him) for the taxpayers.

*Thomas A. Barnico,* Assistant Attorney General, for Commissioner of Revenue.

*Shirley K. Sicilian & Sheldon H. Laskin,* of the District of Columbia, for Multistate Tax Commission, amicus curiae, submitted a brief.

*Todd A. Lard & Frederick J. Nicely,* of the District of Columbia, *& Kathleen King Parker,* for Council on State Taxation, amicus curiae, submitted a brief.

SPINA, J. The present appeal is from a decision of the Appellate Tax Board (board) affirming the denial by the Commissioner of Revenue (commissioner) of applications by the taxpayers, Capital One Bank (Capital One) and Capital One F.S.B. (FSB) (collectively, Capital banks), for the abatement of financial institution excises (FIET).[2] Capital One sought abatement for the tax years 1995 through 1998, and FSB sought abatement for the tax years 1996 through 1998. At issue is whether, consistent with the Federal commerce clause of the United States Constitution art. 1, § 8, the Commonwealth can impose the FIET, pursuant to G. L. c. 63, § 2, on financial institutions[3] that do not have a physical presence in Massachusetts. We granted the Capi-

---

[2]The Appellate Tax Board (board) noted that G. L. c. 63, § 2, imposes an excise, not a tax, on financial institutions. For an extensive discussion of the historical differences between a tax and an excise, see P. Nichols, Taxation in Massachusetts 15-17 (3d ed. 1938). Here, for consistency and ease of reference, we, like the parties and the board, shall refer to the excise at issue as the financial institution excise tax (FIET).

[3]A "[f]inancial institution" includes "any bank, banking association, trust company, federal or state savings and loan association, including all banks for cooperatives organized under the United States Farm Credit Act of 1933, whether of issue or not, existing by authority of the United States, or any state, or a foreign country, or any law of the commonwealth." G. L. c. 63, § 1.

tal banks' application for direct appellate review, and now affirm the board's decision.[4]

The board found the following facts, based on the parties' detailed stipulation of facts and the testimony and exhibits introduced at the hearing. See G. L. c. 58A, § 13 ("The decision of the board shall be final as to findings of fact"); *United Church of Religious Science* v. *Assessors of Attleboro*, 372 Mass. 280, 281 (1977).

In 1994, Capital One was established as a wholly owned subsidiary of Capital One Financial Corporation (COFC), a Delaware corporation. Capital One is a Virginia-chartered credit card bank that offers credit card products. FSB was established in 1996, also as a wholly owned subsidiary of COFC. It is a federally chartered savings bank that offers consumer lending and deposit products, including secured and unsecured credit cards, to individuals and small businesses. FSB also makes unsecured installment loans and has a consumer home loan business.

The commercial domicil for each bank is Virginia, where credit approval activities occurred. During the tax years at issue, the Capital banks neither owned nor leased any real property in the Commonwealth. Further, the board assumed, based on the record before it, that the Capital banks owned no other Massachusetts property,[5] and no employee, agent, or independent contractor of the Capital banks was located in Massachusetts during the tax years at issue. As credit card issuers doing business in the Commonwealth, the Capital banks had been required to file quarterly credit card issuer's reports with the Massachusetts division of banks. See G. L. c. 140, § 114C, inserted by St. 1987, c. 595, § 1.[6]

COFC is the owner of the trademark "Capital One," which it

---

[4]We acknowledge the amicus brief filed by Multistate Tax Commission in support of the board, and the amicus brief filed by the Council on State Taxation in support of Capital One Bank and Capital One F.S.B.

[5]The board noted that it was unclear whether credit card readers used by merchants were the property of the Capital banks, the merchants, or some other entity. Further, the record was not clear as to whether the cardholders, the Capital banks, or both had ownership of the credit cards themselves. The board stated that because its decision was not dependent on the Capital banks' ownership of property or other physical presence in Massachusetts, the ownership of the credit cards and the card readers was immaterial.

[6]In 1996, the filing requirement for a credit card issuer's reports was

provided to the Capital banks, without license or royalty, for placement on their credit cards. Using a system called "Information-Based Strategy," which employs statistical modeling techniques to segment potential customer lists based on credit scores, demographics, and other characteristics, the Capital banks targeted specific potential customers nationwide, including customers in the Commonwealth. As pertinent here, the Capital banks then entered into agreements with Massachusetts residents for the issuance of "general purpose" credit cards branded with the "Capital One" trademark and the logo of either Visa U.S.A. Inc. (Visa), or MasterCard International (Master-Card).[7] Pursuant to these agreements, the Capital banks would advance funds on behalf of their customers for transactions in which the customers used a "Capital One" Visa-branded or MasterCard-branded credit card to make purchases of goods and services from merchants nationwide. The Capital banks also would allow customers to obtain cash advances at Capital banks nationwide displaying the Visa or MasterCard logo, or at bank automated teller machine (ATM) kiosks displaying the Visa or MasterCard logo, or at ATM kiosks displaying the PLUS or CIRRUS logo, if such logo also appeared on the credit card.[8] The Capital banks' customers agreed to repay the advanced funds, subject to finance charges and other fees set forth in their credit card agreements.

---

changed from quarterly to semiannually. See St. 1996, c. 359, § 2. Subsequent legislation deleted this filing requirement from G. L. c. 140, § 114C, altogether. See St. 2002, c. 455, § 1.

[7]Visa and MasterCard are structured as open associations whose members issue Visa-branded or MasterCard-branded payment cards, acquire merchants that will accept such payment cards, or do both. Visa and MasterCard provide services for their members, including the authorization, settlement, and clearance of transactions. With certain limited exceptions, Visa's membership is open to any institution that is eligible for Federal Deposit Insurance Corporation deposit insurance or share insurance. As of 2005, Visa had approximately 14,000 members in the United States, including over 12,000 Visa card issuers (and had similar membership numbers during the tax years at issue). Master-Card's membership is generally open to any organization that is authorized to engage in financial transactions under the laws or government regulations of the country in which it is organized or principally engaged in business, subject to additional requirements set out in MasterCard bylaws and rules.

[8]The PLUS name is a trademark owned by Visa International Service Association and licensed to Visa. The CIRRUS name is a trademark owned by MasterCard.

As members of the Visa and MasterCard associations, the Capital banks paid fees to those associations relating to credit card transactions nationwide, including transactions by the Capital banks' Massachusetts customers. In return, the Capital banks received numerous benefits from the Visa and MasterCard associations, including technology and equipment necessary to process credit card transactions. On a larger scale, the Capital banks were able to access a nationwide interconnected credit infrastructure that provided enormous value both to their own businesses and to the Capital banks' customers.

A typical credit card transaction proceeded as follows. When a Massachusetts customer presented a "Capital One" Visa-branded or MasterCard-branded credit card in payment for goods or services, the cardholder or merchant would "swipe" the card through a card reader located at the merchant's place of business. The credit card information would be relayed to an "acquiring bank" with which the merchant had contracted for the handling of credit card transactions. The acquiring bank verified, processed, and transmitted the credit card information to Visa or MasterCard, which, in turn, relayed the transaction information to the cardholder's "issuing bank" (here, the Capital banks), which then checked the cardholder's credit line and account status. Assuming that the cardholder had sufficient credit, the issuing bank approved the transaction, and such approval was sent by the issuing bank through the association network to the acquiring bank, which relayed the approval to the merchant at the point of sale. This process occurred in one rapid series of events. Subsequently, payment requests were sent by the merchant to the acquiring bank, which forwarded them to the issuing bank for reimbursement. The issuing bank paid the acquiring bank the amount requested, less an "interchange fee." The acquiring bank then retained its own processing fee from the amount received, and paid the remainder to the merchant.[9] During the tax years at

[9]To put these fees in perspective, the board noted that in a typical Visa or MasterCard transaction, the issuing bank retained an "interchange fee" of approximately 1.4 per cent of the transaction price, and the acquiring bank retained an additional fee of approximately .6 per cent. Consequently, a total of approximately 2.0 per cent of the transaction amount, known as the "merchant discount," would be paid to the issuing and acquiring banks. See *United States* v. *Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003).

issue, the Capital banks received interchange fees related to Massachusetts customers ranging between $4.2 million and $6.8 million annually.

By issuing credit cards with the "Capital One" logo to Massachusetts customers, the Capital banks essentially were guaranteeing payment to merchants of the amounts charged by those customers, if approved. The Capital banks bore the risk of a cardholder's nonpayment. In the event of such nonpayment, the Capital banks worked with collection agencies[10] and Massachusetts attorneys to collect delinquent accounts, which included the filing of civil actions on behalf of the Capital banks in Massachusetts courts. When necessary, the Capital banks obtained garnishments or liens against their customers' personal property, and, on two occasions, secured writs of execution against Massachusetts real property. If legal proceedings were commenced in Virginia against Massachusetts residents under the Virginia long-arm statute, Va. Code Ann. § 8.01-328.1 (2007), the resulting judgments were, at times, domesticated to Massachusetts for further enforcement proceedings. In addition, the Massachusetts Attorney General's office, through its consumer complaints and information section, helped resolve disputes between the Capital banks and Massachusetts residents during the tax years at issue.

As a result of the Capital banks' marketing efforts in the Commonwealth, the number of Massachusetts residents carrying Capital One credit cards rose from 196,645 in 1995 to 465,571 in 1998, and the number of Massachusetts residents carrying FSB credit cards rose from 3,845 in 1996 to 7,363 in 1998. In total, the Capital banks spent more than $20 million, through its marketing efforts, to acquire Commonwealth residents as customers during the tax years at issue. Capital One's outstanding receivables from accounts held by Massachusetts cardholders grew from $72,162,796 in 1995 to $113,655,624 in 1998. FSB's outstanding receivables from accounts held by Massachusetts cardholders grew from $11,457,826 in 1996 to $16,588,914 in 1998. Capital One's income, derived from interest, fees, and penalties associated with the use of its credit cards by Massachusetts residents, rose from $22,319,653 in 1995 to $57,941,377 in 1998. FSB's

---

[10]None of the collection agencies used during the tax years at issue was located in Massachusetts.

income, derived from the same sources, rose from $1,534,525 in 1996 to $3,483,093 in 1998.

On February 28, 2000, in response to notification from the commissioner that they had not filed FIET returns for the tax years at issue, the Capital banks provided the Department of Revenue (department) with apportionment and other relevant information. On August 6, 2000, the department issued to the Capital banks separate notices of intention to assess, followed shortly thereafter by notices of assessment for the tax years at issue. The amounts of the assessments were $1,758,454 for Capital One, and $159,075.25 for FSB. The Capital banks filed timely applications for abatement of the FIET. See G. L. c. 62C, § 37. The commissioner denied the applications, and the Capital banks appealed to the board pursuant to G. L. c. 62C, § 39.

In affirming the commissioner's denial of the abatements, the board stated that the Capital banks' activities in Massachusetts constituted a "substantial nexus" with the Commonwealth that justified imposition of the FIET for the tax years at issue. In particular, the board based its determination on the Capital banks' purposeful, targeted marketing of their credit card business to Massachusetts customers; their required filing of quarterly credit card issuer's reports with the Massachusetts division of banks; their use of the Massachusetts court system and the Massachusetts Attorney General's office to collect delinquent accounts and resolve disputes; their use of sophisticated networks, including the Visa and MasterCard associations and Massachusetts acquiring banks, which linked the Capital banks with Massachusetts customers and merchants, and by which the Capital banks, through their customers' use of "Capital One"-branded credit cards, guaranteed payment to the merchants on behalf of the customers; and their receipt of hundreds of millions of dollars in income from millions of transactions involving Massachusetts residents and merchants.[11] The board stated that, pursuant to its reading of *Quill Corp.* v. *North Dakota*, 504 U.S. 298 (1992) (*Quill*), a

---

[11]The Capital banks contend that the record does not show that they actually filed any credit card issuer's reports with the Massachusetts division of banks or initiated contact with the Attorney General's office. The Capital banks may not, in fact, have filed any reports pursuant to G. L. c. 140, § 114C, but the statutory language suggests that they were required to do so. In addition, even if the Capital banks did not initiate any contact with the Attorney

financial institution's "physical presence" in the taxing State was not required to establish "substantial nexus" for purposes of the State's imposition of an income-based tax on that institution. Consequently, the board concluded that the Commonwealth's assessment of the FIET on the Capital banks was constitutional under the Federal commerce clause.[12]

A decision by the board will not be modified or reversed if the decision "is based on both substantial evidence and a correct application of the law." *Boston Professional Hockey Ass'n* v. *Commissioner of Revenue*, 443 Mass. 276, 285 (2005). We presume that a tax is constitutionally valid unless the party challenging it establishes its invalidity "beyond a rational doubt." *Andover Sav. Bank* v. *Commissioner of Revenue*, 387 Mass. 229, 235 (1982). While we give deference to the board's expertise in interpreting the tax laws of the Commonwealth, see *French* v. *Assessors of Boston*, 383 Mass. 481, 482 (1981), we apply our independent judgment as to both the law and the facts on constitutional issues. See *Opinion of the Justices*, 328 Mass. 679, 687 (1952).

The thrust of the Capital banks' appeal is that the board erroneously limited to the sales and use tax context the United States Supreme Court's holding in *Quill, supra* at 317-318, that the Federal commerce clause precludes a State from imposing tax obligations on an out-of-State corporation that has no physical presence in the taxing State. In the Capital banks' view, this physical presence requirement should be equally applicable to a State's assessment of an income-based excise, like the FIET. The Capital banks contend that the board disregarded the reasons stated in *Quill* for upholding a "bright-line" test for tax liability and the benefits of such a clear standard. Contrary to the board's determination, the Capital banks continue, sales and use taxes do not impose a more significant burden on interstate commerce

General's office, Massachusetts consumers filed complaints against them with that office, and the Capital banks responded to those complaints.

[12] The board also concluded that the privileges associated with the Capital banks' right to do business in Massachusetts and the Capital banks' sale of financial services in the Commonwealth were "commodities," and that the FIET was a "reasonable" excise on such commodities under the Massachusetts Constitution. See Part 2, c. 1, § 1, art. 4, of the Constitution of the Commonwealth. The Capital banks have not challenged this determination in the present appeal, so we need not consider it further.

than income-based taxes such that the two types of taxes should be treated differently under the commerce clause. For these reasons, the Capital banks argue that the FIET should be deemed unconstitutional as inconsistent with the Federal commerce clause. We disagree.

Pursuant to G. L. c. 63, § 2, "every financial institution engaged in business in the commonwealth shall pay, on account of each taxable year, an excise measured by its net income determined to be taxable under [G. L. c. 63, § 2A,] at the [designated] rate."[13] The Capital banks have not asserted that they are not "financial institutions" for purposes of imposition of the FIET. See G. L. c. 63, § 1 (defining "[f]inancial institution"). As pertinent to the factual circumstances here, the phrase "engaged in business in the commonwealth" includes "regularly engaging in transactions with customers in the commonwealth that involve intangible property and result in income flowing to the taxpayer from residents of the commonwealth." *Id.* These activities "shall be presumed, subject to rebuttal, to be conducted on a regular basis within the commonwealth, if any of such activities are conducted with one hundred or more residents of the commonwealth during any taxable year or if the taxpayer has ten million dollars or more of assets attributable to sources within the commonwealth, or has in excess of five hundred thousand dollars in receipts attributable to sources within the commonwealth." *Id.* The Capital banks have challenged the imposition of the FIET only on constitutional grounds; they have not rebutted the statutory presumption that they have regularly engaged in business in Massachusetts.

A State's ability to tax businesses like the Capital banks, that operate in interstate commerce, "is constrained by the Federal government's broad power to regulate interstate commerce under the commerce clause."[14] *Aloha Freightways, Inc.* v. *Commissioner of Revenue,* 428 Mass. 418, 421 (1998). The commerce

---

[13]General Laws c. 63, § 2A (*b*), provides that "[i]f the financial institution has income from business activity which is taxable both within and without this commonwealth, its net income shall be apportioned to this commonwealth by multiplying its net income by the apportionment percentage."

[14]Because the Capital banks have challenged the constitutionality of the FIET under only the commerce clause, that is the focus of our consideration. Nonetheless, we point out that a State's ability to tax businesses operating in

clause authorizes Congress to "regulate Commerce . . . among the several States." Art. 1, § 8. The United States Supreme Court has consistently held that the commerce clause includes "a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject." *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). See *Quill, supra* at 309-312 (discussing evolution of dormant commerce clause).

Consistent with the commerce clause, a State may impose a tax on a business engaged in interstate commerce where the tax "[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Complete Auto Transit, Inc.* v. *Brady*, 430 U.S. 274, 279 (1977) (*Complete Auto*). See *Truck Renting & Leasing Ass'n* v. *Commissioner of Revenue*, 433

---

interstate commerce also is constrained by the due process clause of the Fourteenth Amendment to the United States Constitution. Although unconstitutional taxation claims under the due process and commerce clauses are closely related, see *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U.S. 753, 756 (1967), they are separate and "pose distinct limits on the taxing powers of the States." *Quill Corp.* v. *North Dakota*, 504 U.S. 298, 305 (1992) (*Quill*). The due process clause and the commerce clause address different constitutional concerns. Due process focuses on "the fundamental fairness of governmental activity" and requires consideration "whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him." *Id.* at 312. Thus, the due process clause requires "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Bros.* v. *Maryland*, 347 U.S. 340, 344-345 (1954). See *International Harvester Co.* v. *Wisconsin Dep't of Taxation*, 322 U.S. 435, 441-442 (1944) ("A state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state or to events or transactions which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers"). See also *Truck Renting & Leasing Ass'n* v. *Commissioner of Revenue*, 433 Mass. 733, 736 (2001). "In contrast, the Commerce Clause and its nexus requirement are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy." *Quill, supra.* Consistent with the due process clause, a State may have the authority to impose a tax based on minimum contacts, but the imposition of such a tax may unconstitutionally burden interstate commerce because the taxpayer lacks a "substantial nexus" with the taxing State. See *id.* at 308, 313.

Mass. 733, 740 (2001). By permitting States to tax purely interstate commerce, the United States Supreme Court affirmed the principle that "interstate commerce may be made to pay its way." *Complete Auto, supra* at 281, 284. See *Commonwealth Edison Co.* v. *Montana*, 453 U.S. 609, 623-624 (1981), quoting *Colonial Pipeline Co.* v. *Traigle*, 421 U.S. 100, 108 (1975) ("It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of [the] state tax burden even though it increases the cost of doing business").

The Capital banks' challenge to the constitutionality of the FIET focuses solely on the first prong of the *Complete Auto* test, namely whether the Capital banks' activities had a "substantial nexus" with Massachusetts.[15] To satisfy this requirement, "[t]he business must have some constitutionally sufficient degree of contact with the taxing State before the State can impose any tax on it." *Aloha Freightways, Inc.* v. *Commissioner of Revenue, supra*. It is a standard that is designed to prevent overreaching by States. *Id.* at 423. "[T]he 'substantial nexus' requirement is not, like due process' 'minimum contacts' requirement, a proxy for notice, but rather a means for limiting state burdens on interstate commerce." *Quill, supra* at 313.

The roots of a "physical presence" requirement under commerce clause analysis were firmly established in *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U.S. 753 (1967) (*Bellas Hess*), which involved a constitutional challenge to a State's assessment of a use tax on goods purchased for use in the taxing State from an out-of-State mail order merchant that had no in-State retail outlets, sales representatives, or property. The United States Supreme Court concluded that a State's assessment of a use tax in such circumstances created an unconstitutional burden on interstate commerce because the merchant's only connections with the taxing State were by mail or common carrier. *Id.* at 758-759. The Court's reasoning for its decision was based, in significant part, on the fact that the many local variations in rates of use tax, in allowable exemptions, and in admini-

---

[15]Because the Capital banks' challenge to the constitutionality of the FIET under the commerce clause pertains only to the first prong of the *Complete Auto* test, we limit our discussion to that requirement.

strative requirements would impede the free conduct of interstate business. *Id.* at 759-760. The very purpose of the commerce clause, the Court stated, "was to ensure a national economy free from such unjustifiable local entanglements." *Id.* at 760.

Twenty-five years later, the United States Supreme Court reaffirmed in *Quill, supra* at 317-318, that, with respect to the imposition of sales and use taxes, the constitutionally sustainable measure of contact required for substantial nexus under the commerce clause was "physical presence" in the taxing State. The Court made a point of stating that "[w]hile contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today," *id.* at 311, the *Bellas Hess* bright-line physical presence requirement was not inconsistent with the four-part *Complete Auto* test, which the Court described as "continu[ing] to govern the validity of state taxes under the Commerce Clause." *Quill, supra* at 310. Nothing, however, in *Quill* suggested that physical presence is required for the imposition of other types of taxes, including an income-based excise such as the FIET. To the contrary, while not repudiating the *Bellas Hess* rule, the Supreme Court stated in *Quill* that it had not, "in [its] review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes." *Id.* at 314 (stating that Court's commerce clause jurisprudence "now favors more flexible balancing analyses"). Moreover, when summarizing the precedent established in *Bellas Hess*, the Court reiterated that, in cases "subsequent to *Bellas Hess* and concerning other types of taxes, [it had] not adopted a similar bright-line, physical-presence requirement." *Id.* at 317. See *Truck Renting & Leasing Ass'n* v. *Commissioner of Revenue, supra* at 740 n.13 (noting that, in *Quill*, Supreme Court did not extend physical presence requirement for imposition of use or sales tax on out-of-State vendor to other types of taxes). Cf. *Borden Chems. & Plastics* v. *Zehnder*, 312 Ill. App. 3d 35, 44 (2000) (declining to extend *Quill*'s physical presence requirement to income-based taxation, but recognizing that such requirement would have been satisfied by taxpayer at issue); *Couchot* v. *State Lottery Comm'n*, 74 Ohio St. 3d 417, 425, cert. denied, 519 U.S. 810 (1996) (same).

The language of the Supreme Court's decision in *Quill*

explicitly emphasized, on more than one occasion, a narrow focus on sales and use taxes for the physical presence requirement, and suggested that this requirement was limited to those specific assessments and did not apply to the imposition of other types of State taxes. We will not expand the Court's reasoning beyond its articulated boundaries, particularly where the Court, itself, has limited its holding to a particular form of taxation.

In a case similar to the present one, the West Virginia Supreme Court of Appeals considered in *Tax Comm'r of W. Va.* v. *MBNA Am. Bank, N.A.*, 220 W. Va. 163, 164-166 (2006), cert. denied sub nom. *FIA Card Services, N.A.* v. *Tax Comm'r of W. Va.*, 127 S. Ct. 2997 (2007) (*MBNA*), whether imposition of that State's business franchise and corporation net income taxes on MBNA America Bank, a Delaware corporation with no physical presence in West Virginia, violated the substantial nexus requirement of the commerce clause. The principal business of MBNA America Bank was issuing and servicing Visa and MasterCard credit cards, which it promoted in West Virginia by mail and telephone solicitation. *Id.* at 164. After considering the evolution of the Supreme Court's interpretation of the dormant commerce clause, the court in *MBNA* concluded that "*Quill's* physical-presence requirement for showing a substantial Commerce Clause nexus applie[d] only to use and sales taxes and not to business franchise and corporation net income taxes." *Id.* at 169.[16]

In reaching its conclusion, the West Virginia Supreme Court of Appeals opined that (1) the United States Supreme Court's decision in *Quill* was based primarily on stare decisis and on the fact that the precedent established in *Bellas Hess* had engendered substantial reliance by the mail order industry, circumstances that did not compel application beyond the context

___

[16]Contrast *J.C. Penney Nat'l Bank* v. *Johnson*, 19 S.W.3d 831, 842 (Tenn. Ct. App. 1999), cert. denied, 531 U.S. 927 (2000) (stating that, while it was not court's purpose "to decide whether 'physical presence' is required under the Commerce Clause," lack of substantial nexus did not justify assessment of franchise and excise taxes on out-of-State credit card company), questioned in America Online, Inc. *vs.* Johnson, Tenn. Ct. App., No. M2001-00927 COA-R3-CV (July 30, 2002) (noting that in *J.C. Penney Nat'l Bank* v. *Johnson, supra*, it might have been more accurate for court to say that "the Supreme Court had rejected state taxes on interstate commerce where no activities had been carried on in the taxing state *on the taxpayer's behalf*" [emphasis in original]).

of sales and use taxes; (2) the Supreme Court appeared to have expressly limited the scope of *Quill* to sales and use taxes; and (3) the Supreme Court's decisions in *Bellas Hess* and *Quill* were based, in part, on the fact that compliance with specific administrative regulations associated with the collection of sales and use taxes unduly burdened interstate commerce, but that the collection of franchise and income taxes did not appear to cause similar compliance burdens.[17] *Id.* at 169-170. The court further stated that the physical presence test "makes little sense in today's world" where, for example, "electronic commerce now makes it

---

[17]Contrary to the Capital banks' assertion, the board's finding that sales and use taxes impose special burdens on interstate commerce was not based on faulty logic. In its discussion of these burdens with respect to an out-of-State mail order company, the United States Supreme Court observed in *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U.S. 753, 759 (1967), that if one State can impede "the free conduct of [such company's] interstate business," then "so can every other State, and so, indeed, can every municipality, every school district, and every other political subdivision throughout the Nation with power to impose sales and use taxes." As a result, the Court stated, "[t]he many variations in rates of tax, in allowable exemptions, and in administrative and record-keeping requirements could entangle [the mail order company] in a virtual welter of complicated obligations to local jurisdictions with no legitimate claim to impose 'a fair share of the cost of the local government.' " *Id.* at 759-760, quoting *Freeman* v. *Hewit*, 329 U.S. 249, 253 (1946). Similarly, in *Quill, supra* at 313 n.6, the Supreme Court noted that upholding one State's imposition of a use tax on an out-of-State mail order company could unduly burden interstate commerce where "similar obligations might be imposed by the Nation's 6,000-plus taxing jurisdictions." Such burdens associated with the imposition of sales and use taxes are not inconsequential. An income-based excise, on the other hand, typically is paid only once a year (except when quarterly estimated taxes are required), to one taxing jurisdiction at the State level, and the payment of such an excise does not entail collection obligations vis-à-vis consumers. See *Tax Comm'r of W. Va.* v. *MBNA Am. Bank, N.A.*, 220 W. Va. 163, 170-171 (2006), cert. denied sub nom. *FIA Card Servs., N.A.* v. *Tax Comm'r of W. Va.*, 127 S. Ct. 2997 (2007). Determinations about whether the Capital banks are subject to the FIET, in the first instance, and how to apportion income from business activity that is taxable within the Commonwealth are the sorts of decisions that, more broadly, can confront all taxpayers, local or out-of-State, when calculating, reporting, and paying taxes on their income. While the making of these determinations is certainly more complex for large corporate taxpayers, it is part of the cost of doing business and is not, in our opinion, unduly burdensome on interstate commerce, particularly where such taxpayers, like the Capital banks, are earning substantial income from their business activities in Massachusetts and where the common usage of computer technology and specialized software has eased the administrative burdens of tax compliance.

possible for an entity to have a significant economic presence in a state absent any physical presence there."[18] *Id.* at 171. The analysis set forth in *MBNA* is persuasive.[19]

Like the West Virginia court, we conclude that the constitutionality, under the commerce clause, of the Commonwealth's imposition of the FIET is determined not by *Quill*'s physical presence test, but by the "substantial nexus" test articulated in *Complete Auto.* Accordingly, we turn to the facts of the present case to determine whether Capital One and FSB had a substantial nexus with this Commonwealth during the tax years at issue.

While the concept of "substantial nexus" is more elastic than "physical presence," it plainly means a greater presence, both qualitatively and quantitatively, than the minimum connection between a State and a taxpayer that would satisfy a due process inquiry. See note 14, *supra.* Simply put, the test is "substantial" nexus, not "minimal" nexus. In addition to their consumer lend-

---

[18]In a separate opinion in *Quill,* Justice White stated: "Perhaps long ago a seller's 'physical presence' was a sufficient part of a trade to condition imposition of a tax on such presence. But in today's economy, physical presence frequently has very little to do with a transaction a State might seek to tax. Wire transfers of money involving billions of dollars occur every day; purchasers place orders with sellers by fax, phone, and computer linkup; sellers ship goods by air, road, and sea through sundry delivery services without leaving their place of business. . . . [A]n out-of-state direct marketer derives numerous commercial benefits from the State in which it does business [and the Court should not, under the commerce clause,] attempt to justify an anachronistic notion of physical presence in economic terms." *Quill, supra* at 327-328 (White, J., concurring in part and dissenting in part). This observation is even more true today than it was in 1992.

[19]In its determination, the board cited several post-*Quill* decisions that upheld the imposition of income-based taxes on out-of-State corporations that had no tangible physical presence in the taxing State. See, e.g., *Geoffrey, Inc.* v. *South Carolina Tax Comm'n,* 313 S.C. 15, 23-24 & n.4, cert. denied, 510 U.S. 992 (1993) (stating that *Quill* did not extend physical presence requirement beyond sales and use taxes, and concluding that licensing intangible property for use in taxing State established substantial nexus for imposition of income-based tax). See also *Lanco, Inc.* v. *Director, Div. of Taxation,* 188 N.J. 380, 383 (2006) (per curiam), cert. denied, 127 S. Ct. 2974 (2007); *Kmart Props., Inc.* v. *Taxation & Revenue Dep't,* 139 N.M. 177, 185-186 (Ct. App. 2001), rev'd on other grounds, 139 N.M. 172 (2005); *A & F Trademark, Inc.* v. *Tolson,* 167 N.C. App. 150, 159-163 (2004), cert. denied, 546 U.S. 821 (2005). While these cases are instructive with respect to their analysis of *Quill,* they are not directly on point factually, because all involved foreign corporations with intangible property (trademarks, trade names, and service marks) that was being used in the taxing State by a licensee.

ing activities, the Capital banks were soliciting and conducting significant credit card business in the Commonwealth with hundreds of thousands of Massachusetts residents, generating millions of dollars in income for the Capital banks. In essence, the Capital banks were providing valuable financial services to Massachusetts consumers, for which the Capital banks were compensated in the form of interest payments, interchange fees, and finance charges. They could not provide such services in the Commonwealth without using Massachusetts banking and credit facilities. In addition, the Capital banks addressed customer complaints with the assistance of the Massachusetts Attorney General's office, and, when necessary, they used the Massachusetts court system to recover payment for delinquent accounts. Based on the findings of the board, we conclude that the Capital banks' activities in Massachusetts established a substantial nexus with the Commonwealth and, therefore, the assessment of the FIET on the Capital banks comported with the Federal commerce clause.

*Decision of the Appellate Tax
Board affirmed.*